Harold D. JOHNSON, M.D., Plaintiff,

v.

GREATER SOUTHEAST COMMUNITY HOSPITAL CORPORATION, et al., Defendants.

Civ. A. No. 90–1992 (RCL).

United States District Court, District of Columbia.

Oct. 19, 1995.

Shelley Hayes, Washington, DC, for Plaintiff.

Christine Angeline Nykiele, Arthur David Burgen, Nicholas Stillwell McConnell, Jackson & Campbell, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on remand from the Circuit Court of Appeals for the District of Columbia. On August 17, 1990, Harold D. Johnson, M.D., an African–American obstetrician-gynecologist, filed a discrimination lawsuit in this court against Greater Southeast Community Hospital of Washington, D.C. ("Greater Southeast" or "Hospital") as well as some individually named defendants. In his complaint, Dr. Johnson set forth a number of antitrust, civil rights, and tort claims involving defendants' alleged conspiracy to terminate his Medical Staff membership and patient privileges at Greater Southeast, Johns Hopkins Health Plan ("Johns Hopkins"), United Health Services, and Columbia Hospital for Women Medical Center ("Columbia Hospital") because of his race. Complete dismissal of this case without prejudice was granted by Judge Revercomb on December 12, 1990. The court ruled that none of Dr. Johnson's claims were ripe for adjudication because Dr. John-

son had not been officially terminated by Greater Southeast.[1] On December 13, 1991, the D.C. Circuit reversed the dismissal and remanded the case for additional fact-finding on the issue whether plaintiff's membership and privileges had been terminated. *Johnson v. Greater Southeast Community Hosp. Corp.*, 951 F.2d 1268, 1273 (D.C.Cir.1991). This court was further instructed to consider plaintiff's claims in the event that they were cured of any ripeness defect. The court now addresses the issues presented on remand.

## I.

## BACKGROUND

Harold D. Johnson, M.D., is a board-certified physician who specializes in obstetrics and gynecology. His relationship with Greater Southeast Community Hospital began with his appointment to the Active Medical Staff of the Hospital in 1981. In addition to Staff membership, the appointment provided Dr. Johnson with hospital privileges that permitted him to present his patients for hospitalization and treatment at Greater Southeast. From 1981 until 1988, Dr. Johnson applied for, and was granted, reappointment to the Active Medical Staff and continued hospital privileges without limitation. In January 1989, however, the Chairman of the Hospital's Department of Obstetrics and Gynecology, Victor Nelson, M.D., reported to the Medical Staff Executive Committee ("MSEC") that he had become aware of some issues related to the quality of health care being received by Dr. Johnson's patients. The MSEC established a six-member *ad hoc* committee to investigate Dr. Johnson's practice.

The MSEC completed its investigation on August 14, 1989 and concluded that Dr. Johnson should be subjected to "a severe reprimand, focused review, [and] concurrent monitoring and supervision of surgical cases for a minimum of 24 months." *Johnson v. Greater Southeast Community Hosp. Corp.*, No. 90–1992, Memorandum Opinion ("Mem. Op.") at 4 (D.D.C. Dec. 12, 1990). Three days later, the Medical Staff President, Odell

---

1. The case was reassigned to the undersigned Judge upon Judge Revercomb's untimely death.

McCants, M.D., notified Dr. Johnson that the MSEC's recommendation would be reviewed by the Hospital Board of Directors, but that in the meantime, the MSEC had placed Dr. Johnson on summary suspension.

An informal hearing before the MSEC to discuss the summary suspension issue was held on August 21, 1989. At the hearing, the MSEC asked Dr. Johnson if he would be willing to accept the MSEC's recommendation for close monitoring and supervision. Dr. Johnson indicated that he would, and signed an agreement setting forth the terms of the monitoring and supervision program on August 23, 1989. Following the signing of the agreement, the MSEC rescinded Dr. Johnson's summary suspension. After further review and approval of the MSEC's actions by both the Hospital Board of Directors and the Board's Quality Assurance Committee, the Board of Directors convened to render a final decision regarding Dr. Johnson's case on October 19 and 23, 1989. At some point during September 1989, Dr. Johnson submitted an application to Greater Southeast for reappointment to the Active Medical Staff for the 1990–91 cycle. The Hospital took no action on the reappointment application.

During the October meetings, the Board considered two courses of action. The first option considered was to retain Dr. Johnson on the Medical Staff subject to the 24–month monitoring and supervision program. The Board, however, chose to exercise the second option of terminating Dr. Johnson's membership and medical privileges altogether. Nevertheless, Dr. Johnson was allowed to continue his practice subject to the monitoring and supervision agreement while he pursued any hearing or appeal rights pursuant to the Hospital's by-laws. On October 24, 1989, the President of the Hospital, Thomas Chapman, informed Dr. Johnson of the Board's decision to terminate his privileges, and indicated that Dr. Johnson would have forty-five days in which to request a formal hearing. Chapman also conveyed to Dr. Johnson the Board's determination that "[p]ending your decision concerning a formal hearing, and during any hearing proceedings, your Medical Staff membership and privileges may con-

tinue under the monitoring agreement you signed on August 23, 1989." *Id.* at 6.

Dr. Johnson requested a formal hearing on the matter. Kurt Darr was appointed Hearing Officer, and hearings were conducted on February 15 and 16, 1990. The hearings were scheduled to resume on March 22, 1990. On March 21, 1990, Dr. Johnson filed an action for breach of contract against Darr in the Superior Court of the District of Columbia, alleging that Darr's decision, in his capacity as Hearing Officer, to permit the Hospital to call an independent expert witness violated the Hospital's bylaws. Dr. Johnson's request for immediate injunctive relief was denied, and the hearing continued on the next day as planned. However, the case against Darr remained pending in Superior Court.

The final day of hearings was scheduled for April 5, 1990. However, Darr notified the parties on April 4 that he would not complete the hearing until the lawsuit in Superior Court was resolved. On April 18, 1995, Dr. Johnson served each member of the Hospital Board of Directors with a brief requesting that the Board reconsider its decision to terminate his Medical Staff membership and privileges. The Board voted to refrain from making any final decision regarding Dr. Johnson's status at the Hospital until the completion of the hearings and the filing of the Hearing Officer's report.

On May 8, 1990, the Superior Court dismissed Dr. Johnson's lawsuit against Darr as unripe. Darr nevertheless refused to continue the administrative proceedings until the parties stipulated that the proceedings were covered by the immunity provisions of the Health Care Quality Improvement Act of 1986, 42 U.S.C.A. § 11111 (1988) ("HCQIA"). Although the Hospital agreed to stipulate, Dr. Johnson refused. Darr subsequently resigned as Hearing Officer on August 2, 1990.

Prior to Darr's formal resignation, Dr. Johnson applied for reappointment to the Courtesy Staff of Columbia Hospital. As part of the reviewing procedure, Columbia Hospital requested that Greater Southeast forward copies of the patient histories at issue during Greater Southeast's investigation of Dr. Johnson's practice along with a

questionnaire completed by Dr. Nelson. Dr. Johnson submitted Columbia Hospital's request to Dr. Nelson by certified mail. According to Dr. Johnson, Dr. Nelson failed to respond promptly, which resulted in the temporary suspension of his privileges at Columbia Hospital.

On August 10, 1990, Greater Southeast contacted Dr. Johnson through counsel to determine how he wished to proceed in light of the Hearing Officer's resignation. The Hospital proposed that the existing hearing record be submitted to the Board so that the Board might make a final determination as to Dr. Johnson's status at Greater Southeast. Dr. Johnson responded by filing this lawsuit on August 17, 1990.

In his complaint, Dr. Johnson alleged a number of antitrust, civil rights, and tort violations.[2] Dr. Johnson's antitrust claims are all rooted in the allegation that the Hospital and certain named defendants conspired to remove him from the existing market of obstetricians by: (1) terminating his Medical Staff membership and privileges at Greater Southeast; (2) precluding him from gaining privileges at Johns Hopkins and United Health Services; and (3) interfering with his reappointment at Columbia Hospital. Dr. Johnson maintained that these actions constituted a clear restraint on trade and commerce in inpatient obstetrical services in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1988), and the comparable provisions of the District of Columbia Code, D.C.Code Ann. §§ 28–4502, 28–4503 (1981).

Dr. Johnson also alleged a series of civil rights violations. Dr. Johnson claimed that the defendants refused to contract with him on racially neutral grounds, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and the Civil Rights Act of 1871, 42 U.S.C. § 1985. In addition, Dr. Johnson claimed that the defendants unlawfully discriminated against him in the terms, conditions, and privileges of his employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the District of Columbia Human Rights Act, D.C.Code § 1–2512 (1981), by their refusal to grant him unrestricted Medical Staff membership and hospital privileges, and their failure to act on his 1989 reappointment application.

Finally, Dr. Johnson claimed that Dr. Edward Hinman, the principal advocate for termination of Dr. Johnson's membership and privileges at Greater Southeast, violated the common law of the District of Columbia when he tortiously induced the Hospital to breach its appointment contract with him by terminating his Staff membership and hospital privileges.

Defendants first moved for dismissal and, in the alternative, for summary judgment on all of Dr. Johnson's claims primarily on the grounds that the claims were not ripe for adjudication because the Hospital had not completed its administrative termination proceedings. Dr. Johnson then moved for summary judgment on the civil rights claims, arguing that the defendants had failed to

---

2. Dr. Johnson's claims were filed against Greater Southeast as well as individually named defendants. At the time of the filing of the complaint, plaintiff had separated the individually named defendants into two classes. The first class—"Individual Non–Medical Defendants"—included: Thomas Chapman, President of the Greater Southeast Community Hospital; Raymond Turner, M.D., President for Medical Affairs; Mary Lou Meyers, Vice President and General Counsel of Greater Southeast. Complaint ¶ 12. The second class of defendants—"Individual Medical Defendants"—included: Mahmood Mohamadi, M.D., Chairman of the Credentials Committee and member of the Hospital Board of Directors; Odell McCants, M.D., President of the Medical Staff; Victor Nelson, M.D. Chairman of the Department of Obstetrics and Gynecology; William R. Coyle, M.D., member of the Department of Obstetrics and Gynecology; and Gail Van Wingerden, M.D., member the Department of Obstetrics and Gynecology. Complaint ¶ 14. One final defendant—Edward Hinman, member of the Hospital Board of Directors—was not classified. Complaint ¶ 13.

Since the initiation of this suit, plaintiff's claims against Mr. Darr, Dr. Mohamadi, and Dr. Van Wingerden have been dismissed. Plaintiff's antitrust claims remain pending against Greater Southeast and all remaining defendants. Complaint ¶¶ 43, 47, 50. Plaintiff's civil rights were originally filed and remain pending against Greater Southeast, and individual defendants Chapman, Turner, Mayers, Hinman, McCants, and Nelson. Complaint ¶¶ 56, 61. Plaintiff's claim of tortious inducement to breach was originally filed and remains pending only against defendant Hinman. Complaint ¶ 67.

meet the burden of articulating a legitimate, non-discriminatory reason that would explain their collective actions against him. The district court denied plaintiff's motion for summary judgment on his civil rights claims and granted defendant's motion to dismiss all claims based on a finding that "because plaintiff's privileges and membership at the hospital remain intact, subject to the monitoring program agreed to by the plaintiff, the plaintiff has suffered no injury which is ripe for judicial consideration at this time under either antitrust law, civil rights law, or in tort."[3] Mem.Op, at 10.

Dr. Johnson appealed the dismissal of his lawsuit and the denial of his motion for partial summary judgment on the civil rights claims. The D.C. Circuit reversed this court's dismissal of Dr. Johnson's case and remanded it for additional fact-finding on the issue whether Dr. Johnson's membership and privileges were in fact terminated at the time of the appeal. The court also instructed this court to consider any of Dr. Johnson's claims that did not suffer a ripeness defect.[4]

## II.

## DISCUSSION

### A. Ripeness: Antitrust Claims

The Court of Appeals remanded the case to the district court for "additional fact-finding on the key jurisdictional fact of whether appellant's Medical Staff membership and privileges at the Hospital have been terminated." See Johnson, 951 F.2d at 1273. The D.C. Circuit was concerned that plaintiff's privileges, although intact at the time of the court's dismissal of plaintiff's case, might have terminated with the expiration of the monitoring and supervising agreement. "If they have, [plaintiff's] claims of injury stemming from his termination no longer suffer any ripeness defect and the court should go on to consider them on the merits." Id.

(footnote omitted). The D.C. Circuit held that plaintiff's civil rights claims did not suffer any ripeness defect and instructed the court to proceed directly with consideration of these claims. However, the court reserved judgment as to the ripeness of defendant's antitrust claims. This court therefore begins with an inquiry into whether plaintiff's antitrust claims still suffer a ripeness defect.

■ Questions of ripeness "go to the power of the federal courts to entertain disputes, *and to the wisdom of their doing so."* Renne v. Geary, 501 U.S. 312, 316, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991). In *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court set forth a practical formula for the resolution of ripeness questions. According to the Court, questions of ripeness turn on "the fitness of the issues for judicial decisions" and "the hardship to the parties of withholding consideration." Id. at 149, 87 S.Ct. at 1515. The ripeness inquiry involves a balancing of the interests of the party seeking relief from an alleged or perceived injury with the court's interest in postponing review until the question arises in a more concrete fashion. Ripeness issues, by their very nature, require a subtle and subjective assessment. As the D.C. Circuit noted in *Continental Air Lines, Inc. v. Civil Aeronautics Bd.,* 522 F.2d 107 (D.C.Cir.1974) "The law of ripeness, once a tangle of special rules and legalistic distinctions, is now very much a matter of common sense." Id. at 124. The court went on to remark: "We do not pretend that the science of assessing an issue's ripeness is an exact one." Id. at 128.

■ The ripeness doctrine derives ultimately from the requirement in Article III of the United States Constitution that federal courts decide only cases and controversies. As the D.C. Circuit aptly pointed out in *DKT*

---

3. The court rejected plaintiff's argument that the terms of the monitoring and supervision agreement constituted "injury" based on a finding that plaintiff had entered into the agreement voluntarily and that plaintiff had demonstrated neither temporary nor permanent damage to his practice as a result of compliance with the agreement. See Mem.Op., at 9.

4. The D.C.Circuit declined to rule on the district court's denial of Dr. Johnson's motion for summary judgment because a court ordered denial of a summary judgment motion is not appealable. See Johnson, 951 F.2d at 1270.

*Memorial Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 (D.C.Cir.1989), " '[t]he question of ripeness goes to our subject matter jurisdiction....' " *Id.* at 298 (quoting *Duke City Lumber Co. v. Butz*, 539 F.2d 220, 221 n. 2 (D.C.Cir.1976)). If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed. *See S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990). The question of ripeness is of such importance that federal courts are required to raise it *sua sponte* even though the parties do not. *See, e.g., Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1361 (6th Cir.1995) *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.1994); *Acierno v. Mitchell*, 6 F.3d 970, 974 (3rd Cir.1993); *Volvo N. Amer. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 63 (2nd Cir.1988).

There is clear precedent for dismissal of antitrust claims on ripeness grounds. *See, e.g., Unity Ventures v. Lake County*, 841 F.2d 770 (7th Cir.1988), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988); *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361 (3rd Cir.1986); *United Steel Workers v. U.S. Steel Corp.*, 492 F.Supp. 1 (N.D.Ohio 1980). Furthermore, there is considerable precedent for dismissal of antitrust claims where the plaintiff has commenced a suit in federal court prior to completion of a hospital's internal peer review procedures. In *Cooper v. Amster*, 645 F.Supp. 46 (E.D.Pa.1986), *aff'd*, 845 F.2d 1010 (3rd Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988), a physician claimed that two hospitals and three physicians violated § 1 of the Sherman Act by failing to refer emergency patients to him. The court, in dismissing plaintiff's action for lack of jurisdiction, stated: "It is little enough to ask that plaintiff get a definitive no from the hospital before he comes to court for an injunction, treble damages, and the whole panoply of Sherman Act relief." *Id.* at 47. In *Colorado Chiropractic Council v. Porter Memorial Hosp.*, 650 F.Supp. 231 (D.Colo.1986), a group of chiropractors and several hospitals demanded $20 million in damages under antitrust laws for defendant's failure to grant them hospital privileges. The court dismissed plaintiff's claim as "re-

mote and speculative and not ripe for adjudication." *Id.* at 236. Similarly, in *Hendrix v. Poonai*, 662 F.2d 719 (11th Cir.1988), hospital officials sought a declaratory judgment that the hospital would be immune from antitrust claims if it were to deny a physician's pending application for readmission to staff membership. In affirming the district court's dismissal of the claim, the Eleventh Circuit noted that "[i]n this case, the federal courts can become involved, if at all, only after the decision is made to deny Dr. P.V. Poonai's readmission application." *Id.* at 722.

█ In the judgment of this court, plaintiff's antitrust claims simply are not ripe for review. Plaintiff asserts that he was injured by the termination of his hospital membership and privileges. However, there is no evidence that plaintiff's membership and privileges have *in fact* been terminated. It is undisputed that as of August 23, 1989, plaintiff retained his Active Medical Staff membership and full hospital privileges at Greater Southeast, subject only to administrative monitoring and supervision of his surgical cases as set forth in the agreement signed by the plaintiff on that day. It is equally undisputed that immediately before and during the arbitration hearing, Dr. Johnson retained his Medical Staff membership and privileges. Plaintiff was notified by the President of the Hospital of the Board's determination that "[p]ending your decision concerning a formal hearing, and during any hearing proceedings, *your Medical Staff membership may continue under the monitoring agreement you signed on August 23, 1989.*" Letter of Thomas Chapman to Plaintiff of Oct. 24, 1989 (emphasis added). Plaintiff displayed similar knowledge of his continuing privileges in his request for an arbitration hearing: "This notice is submitted with the *understanding that Dr. Johnson will retain his medical privileges* at the Greater Southeast Community Hospital *until such time as the termination proceedings are concluded and there has been a final decision* on the proposed termination." Letter from Plaintiff to Thomas Chapman of Dec. 6, 1989. The arbitration hearing in which the termination issue was being dis-

cussed stalled midstream with the resignation of the Hearing Officer, Kurt Darr. No official recommendation was made by Darr as to whether plaintiff's membership and privileges should or should not be terminated. In the absence of a definitive recommendation, the Hospital Board of Directors has refused to make a final decision to terminate Dr. Johnson's membership and privileges. It is clear, then, that plaintiff's Medical Staff membership and hospital privileges remain in effect.

■ Plaintiff contends that his Staff membership and hospital privileges expired by operation of law on August 23, 1991 when the Hospital failed to grant or deny his application for reappointment to the Medical Staff within the 120–day period prescribed by D.C.Code Ann. § 32–1307(f) (1981) following the termination of the monitoring and supervision agreement. Plaintiff's argument, however, misconstrues the statutory provision. Nowhere does § 32–1307(f) indicate, let alone suggest, that a health professional's staff membership or clinical privileges automatically terminate following the expiration of the 120–day period. Section 32–1307(f) regulates appointment applications and the speed at which applications for reappointment are to be acted upon. The provision imposes on the hospital an obligation to act on an application within 120 days. To invoke § 32–1307(f), plaintiff must submit an application for reappointment and provide evidence that the hospital failed to act on the application within 120 days. Following the expiration of the 120–day period, plaintiff would be able to file suit under the statute to enforce hospital review of the pending application, and, if successful, plaintiff would be entitled to an appointment to the Medical Staff.

■ Section 32–1307(f) appears wholly inapplicable to the present proceedings. The expiration of plaintiff's monitoring and supervision agreement with the hospital cannot be said to trigger § 32–1307(f). When plaintiff's monitoring and supervision agreement expired, plaintiff returned to full and unencumbered membership and privilege status. In

accordance with the letter sent by the President of the Hospital, plaintiff's membership and privileges were intended to remain at this level until the termination of the administrative proceedings. The court therefore finds that plaintiff's Medical Staff membership and privileges were terminated neither by administrative proceeding nor by operation of law.

■ The gravamen of Dr. Johnson's alleged injury is that he was unable to present patients for treatment at the hospital. Dr. Johnson has provided no evidence whatsoever that this ever occurred. At no point has Dr. Johnson indicated that he presented a patient for treatment that was summarily turned away from Greater Southeast. Where a physician officially retains his hospital privileges and, consequently, his ability to admit patients to the hospital, the physician cannot sustain a claim of injury based solely on the allegation that he would not be permitted to exercise his privileges if he had wished to do so. Plaintiff must do more than speculate. At a minimum, plaintiff must show some failed attempt to exercise his privileges. Dr. Johnson never presented a patient for treatment at the Greater Southeast during this period. Had Dr. Johnson done so, and been unable to secure the patient's admittance to the hospital, there is little doubt that this would constitute actionable harm. However, the court will not infer injury in the absence of such an evidentiary showing. Since plaintiff still has the ability to admit patients to the hospital, the significance of the antitrust claims in terms of actual damages or ability to prove damages evaporates. In light of plaintiff's failure to make a sufficient showing of injury, the court finds plaintiff's antitrust claims unripe for review and therefore not justiciable in federal court. Accordingly, plaintiff's antitrust claims under the Sherman Act, with respect to his Staff membership and hospital privileges as Greater Southeast, shall be dismissed for lack of jurisdiction.[5]

Plaintiff also alleged that defendants conspired to preclude his membership in the

**5.** In light of the court's dismissal of plaintiff's antitrust claims with respect to plaintiff's membership and privileges at Greater Southeast, on ripeness grounds, the court also shall deny all of defendant's pending motions for summary judgment on this issue as moot.

Johns Hopkins Health Plan and United Health Services, and to interfere with his application to the Courtesy Staff at Columbia Hospital. The D.C. Circuit correctly pointed out that if plaintiff were able to prove such a conspiracy, plaintiff would be entitled to damages under § 4 of the Clayton Act, regardless of whether plaintiff's membership and privileges had been terminated at Greater Southeast. *See Johnson,* 951 F.2d at 1275.

 Plaintiff bears the burden of pleading and proving an illegal conspiracy under the Sherman Act. To do so, plaintiff must: (1) demonstrate that each defendant made a conscious commitment to an illegal conspiracy; (2) present competent evidence that each defendant took acts in furtherance of that conspiracy; and (3) make a showing that the conspiracy was the proximate cause of antitrust injury to the plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Cooper v. Forsyth County Hosp. Auth., Inc.,* 789 F.2d 278 (4th Cir.1986), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986).

 Plaintiff alleged in his complaint that defendants conspired to preclude his membership from Johns Hopkins and United Health Services. In July 1989, Greater Southeast entered into an exclusive agreement with Johns Hopkins to provide in-patient services to the Plan's subscribers in the District of Columbia. At the same time, Greater Southeast entered into a separate agreement with United Health Services, an affiliate of Greater Southeast, to offer prepaid health care services to members of Johns Hopkins. In September 1989, plaintiff's applications for membership in the Johns Hopkins and in United Health Services were denied on quality of patient care grounds.

The D.C. Circuit construed plaintiff's pleadings on this matter as alleging a separate conspiracy—that is, in addition to conspiring to preclude plaintiff's membership and privileges from Greater Southeast, defendants also conspired to prevent plaintiff from being able to contract with Johns Hopkins and United Health Services. Plaintiff's pleadings, however, plainly indicate that the allegations regarding Johns Hopkins and United Health Services were intended to serve as examples of acts "[i]n furtherance of said combination and conspiracy [to boycott plaintiff from maintaining Medical Staff membership and privileges at Greater Southeast]" and were *not* intended to allege a separate conspiracy. Complaint ¶ 45. Plaintiff therefore did not allege a separate antitrust claim regarding Johns Hopkins and United Health Services, but rather supported his existing antitrust claims with evidence of the denial of his application to these two Plans. The court, however, has dismissed as unripe the antitrust claims that this evidence was intended to support. Accordingly, the court need not consider the evidence of the denial of plaintiff's applications any further.

 It should be noted, however, that if plaintiff had intended alleged a separate conspiracy, he has provided little, if any, evidence in support of it. Plaintiff provided no evidence that any defendant made a conscious commitment to such a conspiracy. Moreover, plaintiff made no showing that defendants' conduct was linked in any way to the Johns Hopkins and United Health Services appointment decisions. In fact, plaintiff fails to allege that defendant engaged in any conduct whatsoever with respect to Johns Hopkins and the United Health Services. The court therefore finds in the alternative that, if plaintiff's allegations regarding the appointment decisions made by Johns Hopkins and United Health Services were intended to constitute a separate antitrust claim, defendants would be entitled to summary judgment because plaintiff failed to make a sufficient showing that defendants in fact conspired to preclude plaintiff from obtaining membership in Johns Hopkins and United Health Services.

 Plaintiff also alleged in his complaint that defendants conspired to interfere with defendant's application for reappointment at Columbia Hospital. According to plaintiff, the Credentials Committee of Columbia Hospital asked plaintiff to secure a completed

questionnaire from the Chief of Obstetrics and Gynecology at each hospital at which he had privileges. Plaintiff provided the questionnaire to defendant Nelson and alleges that defendant Nelson failed to return the questionnaire in a timely fashion. Plaintiff contends that he suffered antitrust injury as a result.

■ The facts, as set forth in plaintiff's complaint, fail to properly allege an antitrust conspiracy. As an initial matter, it is unclear under plaintiff's recitation of the facts whether any other defendants conspired with Dr. Nelson to delay Dr. Nelson's response. Plaintiff provided no evidence that the other defendants were aware of Dr. Nelson's conduct or that each of them had made conscious commitment to support Dr. Nelson in that regard. Moreover, plaintiff's alleged conspiracy implicated the conduct of only one of the defendants. Plaintiff made his request to the Chief of the Obstetrics and Gynecology department, and it was the Chief of the department that delayed in his response. Plaintiff simply has not demonstrated that any defendant other than Dr. Nelson engaged in conduct in furtherance of the alleged conspiracy. Thus, plaintiff also failed to make a sufficient showing of multiplicity to sustain his conspiracy allegations. Accordingly, the court shall grant defendants' motion for summary judgment dismissing plaintiff's claims involving Columbia Hospital.[6]

## B. Civil Rights Claims

Defendants filed a number of dispositive motions during May of 1993, including a motion for summary judgment on plaintiff's civil

rights claims.[7] Thereafter, the parties became mired in discovery disputes. In the meantime, plaintiff filed a motion to stay the briefing schedule so that he could continue discovery. On January 31, 1995, the court denied plaintiff's motion to stay the briefing schedule and advised plaintiff that he would have 30 days from the date of the court's Order in which to file oppositions to defendants' dispositive motions; otherwise, the court would treat defendants' motions as conceded.

The following week, plaintiff filed a motion for reconsideration and for extension of time. Plaintiff's counsel indicated that, due to ongoing and incomplete discovery and the press of litigation in other cases, she would be unable to meet the court ordered filing deadline. In a court Order dated April 12, 1995, the court granted plaintiff's motion to extend the deadline for filing oppositions an additional four months until June 1, 1995. However, the court made clear in the Order that "[t]his date will not be further enlarged." *Id.*

Despite a clear pronouncement from this court that no additional time to respond would be granted, plaintiff failed to oppose four of defendants' motions for summary judgment by the June 1, 1995 deadline.[8] On June 2, 1995, plaintiff filed a motion for a trifurcated briefing schedule and an enlargement of time in which to file his opposition. Two weeks later, plaintiff filed a motion for leave to file an opposition to defendants' motion for summary judgment on the civil rights claims, out of time. Plaintiff's counsel reiterated many of the same arguments as-

---

6. It should be noted that, even if plaintiff's antitrust claims were ripe for adjudication, the court would nevertheless be compelled to grant defendants' motion for summary judgment on all antitrust claims because plaintiff did not oppose any of them, except for defendants' motion for summary judgment on the grounds of HCQIA immunity. Although plaintiff opposed defendants' original motion for summary judgment, which was filed prior to the appeal, plaintiff did not oppose any of defendants' subsequent motions for summary judgment on all antitrust claims filed after the case was remanded to this court for further proceedings. Under local Rule 108(b), a court may treat an unopposed motion for summary judgment as conceded by the nonmoving party.

7. During this time, defendants also filed motions for summary judgment on the antitrust claims and a motion for summary judgment on plaintiff's claims against defendant Hinman.

8. These four motions were: Motion of Defendants for Summary Judgment on Counts I, II, III, and IV of the Complaint; Motion for Defendants for Summary Judgment on Antitrust Claims For The Absence of Antitrust Injury; Motion of Defendants For Summary Judgment on Civil Rights Claims; and Motion of Defendant Edward J. Hinman, M.D., For Summary Judgment on Count VI.

serted in her previous request for extension of time, including the press of litigation in other cases. Plaintiff's counsel also indicated that the briefing schedule set up by the court placed "an unfair burden" upon plaintiff and plaintiff's counsel to require an "instantaneous response" to defendant's motions. Plaintiff's counsel therefore requested leave of court to file plaintiff's oppositions out of time.

Plaintiff's contention that the Order required an "instantaneous response" is completely unfounded. All of defendants' motions for summary judgment, including defendants' motion for summary judgment on plaintiff's civil rights claims, had been pending before this court for nearly two years when plaintiff's June 1, 1995 due date expired. Plaintiff was served with defendants' motion for summary judgment on the civil rights claims on April 27, 1993, and from that point forward, was in a position to prepare a response. Moreover, even if plaintiff had ignored the defendants' motion when it was served, plaintiff was made aware of the need to respond to the motion five months prior to the June 1, 1995 deadline in the Court's January 31, 1995 Memorandum Opinion.

What is more disturbing about plaintiff's argument, however, is his claim that the June 1, 1995 deadline set forth in the April 12, 1995 Order is "an unfair burden" on plaintiff and plaintiff's counsel. Plaintiff seems to have forgotten that the April 12, 1995 Order *granted* plaintiff's request for an extension of time, and that the June 1, 1995 due date, which plaintiff now decries as "an unfair burden," *was a date selected and requested by plaintiff.* In plaintiff's own words:

> Plaintiff Harold D. Johnson, M.D., *hereby moves this Court for 90–day enlargement of time, to and including June 1, 1995,* in which to respond to Defendant's motions for summary judgment in this proceeding.

Plaintiff's Feb. 7, 1995 Mot.Enlarg.Time, at 1 (emphasis added). The court's April 12, 1995 Order provided the exact relief sought by plaintiff. It is simply preposterous that plaintiff now claims that this relief is an "unfair burden" imposed on him by this court.

■ Plaintiff has had more than ample time to prepare oppositions to defendants' dispositive motions, including the motion for summary judgment on civil rights claims. Plaintiff was served with defendants' motion for summary judgment on civil rights claims over two years ago. Since then, plaintiff has had a substantial opportunity to prepare an opposition. Moreover, even if plaintiff had not prepared an opposition before 1995, this court by its January 31, 1995 Order made plaintiff aware of the need to respond to defendants' motion. Furthermore, plaintiff's request for an additional extension until June 1, 1995 to file an opposition to defendants' motion was *granted.* The latter Order cannot be construed as placing "an unfair burden" on plaintiff now that plaintiff failed to meet his own filing deadline. The court made clear in the Order that no more extensions would be granted. Accordingly, the court shall deny both plaintiff's motion for a trifurcated briefing schedule and enlargement of time, and plaintiff's motion for leave to file out of time an opposition to defendants' motion for summary judgment on civil rights claims.[9]

■ The court shall grant Defendant's unopposed motion for summary judgment dismissing on all civil rights claims as conceded pursuant to local Rule 108(b). Moreover, for the reasons set forth below, the court would be compelled to grant defendants' motion for summary judgment on the civil rights claims even if defendants' motion was not treated as conceded.

### 1. Claims Under the Civil Rights Acts of 1866 and 1871

■ Plaintiff alleged that the defendants refused to contract with him on racially neutral grounds, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1871, 42 U.S.C. § 1985. Under the facts of this case, however, plaintiff fails to state a claim under either § 1981 or § 1985. The determinative issue with respect to plaintiff's § 1981 claim is whether the defendants' conduct violates federal

---

**9.** In light of the court's denial of plaintiff's motion to file out of time, defendants' motion to strike plaintiff's late submissions on the civil rights issue is denied as moot.

rights secured by the Civil Rights Act of 1866, 42 U.S.C. § 1981. Section 1981 provides in pertinent part as follows:

Any persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

*Id.* at § 1981(a). The scope of this provision was recently addressed by the Supreme Court in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In *Patterson,* a black woman had been employed for 10 years as a teller and file coordinator at a credit union until she was laid off. She then filed a § 1981 lawsuit alleging that her employer harassed her, failed to promote her to the position of accounting clerk, and then discharged her, all due to her race. The Court affirmed the lower court's ruling that racial harassment was not actionable under § 1981 because the provision expressly prohibits discrimination *only* in the making and enforcement of contracts. The provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contractual obligations. *See id.* at 170, 109 S.Ct. at 2369. The Court stated:

The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract, only on discriminatory terms. But the right does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or *imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract.*

*Id.* at 176–77, 109 S.Ct. at 2372–73. The D.C. Circuit expressly adopted the *Patterson* decision in *Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565 (D.C.Cir.1991), *vacated and remanded,* 502 U.S. 1068, 112 S.Ct. 960, 117 L.Ed.2d 127, *aff'd on remand,* 975 F.2d

886 (D.C.Cir.1992).[10] In *Gersman,* the D.C. Circuit addressed the issue whether allegations of "failure to renew" satisfy a plaintiff's need to demonstrate a "refusal to contract" under § 1981. Plaintiff argued that the parties were free to modify the price term under the existing contract, and defendants' alleged failure to consider a new price structure constituted a refusal to contract under § 1981. The court, however, observed that § 1981 is only applicable when a *new* contractual relationship is contemplated. Contract modification, by contrast, is governed by the existing contract. Thus, defendant's actions, which resulted in the termination of the contractual relationship, were not actionable under § 1981. *See id.* at 1573. In dismissing plaintiff's § 1981 claim, the *Gersman* court stated:

"We agree with the majority of Circuits who have held that, under *Patterson,* § 1981 does not apply to contract terminations. We find this conclusion appropriate in terms of the language of both § 1981 and the *Patterson* opinion. The Court was clear in stating that § 1981 'does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations.' "

*Id.* at 1571 (citation omitted).

Dr. Johnson's § 1981 claim is analogous to plaintiff's claim in *Gersman.* The claim is styled as a refusal "to enter into a contract with plaintiff on racially neutral terms" and a refusal "to allow plaintiff to contract with Defendant Hospital on the same basis as 'white' physicians were permitted to contract." Complaint, ¶¶ 56 and 57. However, it is clear from plaintiff's recital of the facts that the conduct at issue occurred after the formation of plaintiff's appointment contract with Greater Southeast.

Plaintiff alleged that he had a continuing contractual relationship with Greater Southeast for nearly a decade. "From 1981 until 1988, he [plaintiff] applied for, and was

10. The Supreme Court granted certiorari, but did not reach the merits of the decision. It simply vacated the judgment and remanded the case to the Court of Appeals for consideration of what impact the newly enacted Civil Rights Act

of 1991 might have on the decision. In *Gersman II,* the court affirmed the district court's dismissal of plaintiff's § 1981 claims based on the *Patterson* decision. 975 F.2d 886, 887 (D.C.Cir.1992).

granted, reappointment to the Active Medical Staff without limitation or incident." Complaint ¶ 22. Defendants supposedly violated § 1981 when they modified plaintiff's hospital privileges by requiring him to comply with the monitoring and supervision program and when defendants allegedly failed to take action on plaintiff's 1989 application for reappointment. *See* Complaint ¶¶ 23, 30. However, Defendants' conduct in both instances is clearly *postformation,* and as such, is simply not actionable under § 1981. *Patterson* recognized the existence of a new contractual relationship only where there is a "new and distinct relation between employee and the employer." *Gersman,* 931 F.2d at 1565 (quoting *Patterson, supra,* 491 U.S. at 185, 109 S.Ct. at 2377). Plaintiff's relationship with Greater Southeast remained substantially the same as it always existed. His Staff membership and privileges continued, subject only to the two-year monitoring and supervision agreement. Following the expiration of the agreement, plaintiff retained full Staff membership and privileges. At no point did either plaintiff or Greater Southeast consider the signing of the monitoring and supervision agreement to be the creation of a "new" contractual relationship. The court therefore rejects plaintiff's argument that the signing of the monitoring and supervision agreement constitutes a "making" of a new contract under § 1981.

The court also rejects plaintiff's argument that Greater Southeast's alleged refusal to act on plaintiff's application for reappointment is actionable under § 1981. The court in *Gersman* ruled that renewals, like postformation modifications, were governed by the existing contract. Accordingly, the Court held that allegations of failure to renew a contract were not actionable under § 1981. *See id.* at 1573. The *Gersman* court is not alone in holding that claims for failure to renew a contract fall outside the scope of § 1981. *See, e.g., Artis v. Hitachi Zosen Clearing, Inc.,* 967 F.2d 1132 (7th Cir.1992); *Hull v. Cuyahoga Valley Joint Vocational*

*School Dist. Bd. of Ed.,* 926 F.2d 505 (6th Cir.1991), *cert. denied, Hull v. Shuck,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Brereton v. Communications Satellite Corp.,* 735 F.Supp. 1085 (D.D.C.1990), *appeal dismissed without op.,* 925 F.2d 488 (D.C.Cir.1991). Because the substance of the facts alleged in the complaint plainly implicates postformation conduct which is not actionable under § 1981, the court would be compelled to grant defendants' motion for summary judgment on plaintiff's § 1981 claims.

▮▮▮▮▮▮ Plaintiff also claimed that defendants conduct violated the Civil Rights Act of 1871, 42 U.S.C. § 1985. Section 1985 provides in pertinent part:

> If two or more persons … conspire … for purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws … the party so injured or deprived may have an action for recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.* at § 1985(3).[11] In *Great Amer. Fed. Sav. & Loan Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court observed that § 1985(3) was a purely remedial in nature, embodying no substantive rights of its own. *See id.* at 372, 99 S.Ct. at 2349. Consequently, the claimant must demonstrate that the defendant's conduct violated the rights, privileges, and immunities under the Fourteenth Amendment that § 1985(3) was intended to vindicate. In this case, plaintiff asserted that his rights under § 1981 were violated, and that such a violation gives rise to a § 1985 remedy. Plaintiff is correct that a violation of federal rights secured by § 1981 may serve as the basis of a § 1985 claim. *See, e.g., Alder v. Columbia Historical Society,* 690 F.Supp. 9 (D.D.C.1988); *Thompson v. Int'l Assoc. of Machinists,* 580 F.Supp. 662 (D.D.C.1984).

11. 42 U.S.C. § 1985, also known as the "Ku Klux Klan Act," was designed to deter the Klan from committing vile transgressive acts against the rights of African–American citizens. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Subsections (1) and (2) prohibit acts that may prevent a federal law enforcement official from performing his duty or otherwise obstruct justice. Neither of these subsections is applicable to this case.

However, as discussed above, plaintiff failed to state a claim under § 1981. Furthermore, violations of Title VII, discussed *infra*, may not be redressed through § 1985. *See Novotny, supra*, 442 U.S. at 378, 99 S.Ct. at 2352. Plaintiff therefore has not set forth any allegations that would entitle him to the remedy provided by § 1985. Accordingly, the court would be compelled to grant defendants' motion for summary judgment on plaintiff's § 1985 claim.

### 2. Title VII Claim

■ Plaintiff also alleged that defendants unlawfully discriminated against him in the terms, conditions, and privileges of his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by their refusal to grant him unrestricted Medical Staff membership and hospital privileges and their failure to act on his application for reappointment to the Medical Staff.[12] Defendants moved for summary judgment with respect to these claims on the grounds that Title VII applies only to employment relationships, and no employment relationship has been implicated in this case. Defendants first presented the undisputed fact that at no point was Dr. Johnson ever employed by Greater Southeast.[13] Defendants went on to argue that the relationship between physician and patient is not one of employment, but more closely aligned to that of an independent contractor. Because no employment relationships were implicated in this case, the defendants urged the court to grant its motion for summary judgment on plaintiff's Title VII claim.

■ Plaintiff conceded that he had never been employed by Greater Southeast, and therefore was not entitled to employee protection in the traditional sense under Title VII. However, plaintiff argued that Title VII also applies to conduct that interferes with employment relationships like the physician-patient relationship, and that Greater Southeast's conduct interfered with his ability to service his patients. Under this latter theory, plaintiff claims he is entitled to Title VII coverage.

Plaintiff relies principally on the D.C. Circuit's opinion in *Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973). In *Sibley*, plaintiff-appellee Wilson, a male private duty nurse, sued Sibley Memorial Hospital for allegedly discriminating against him in violation of Title VII. The plaintiff was not an employee of the hospital, but rather was listed with an independent nurses' registry. Patients at the defendant-hospital who required the services of a private duty nurse would submit a request to a hospital staff person, who would then notify the nurse's registry. The registry matched the request with the name of an available nurse. The nurse would be informed of the assignment and report directly to the patient's room. On two occasions, when the requesting patient was female and Wilson was "matched" by the registry, the hospital's supervisory nurses refused to let him report to the patient. The court, in holding that the relationship between Wilson and Sibley Memorial Hospital was sufficient to bring the case within the ambit of Title VII, stated:

> We think it significant that the Act has addressed itself directly to the problems of interference with the direct employment by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties.

*Id.* at 1342. Dr. Johnson argued that the relationship between physician and patient could be similarly characterized as one of employment, and that Medical Staff member-

---

12. 42 U.S.C. § 2000e–2(a)(1) provides in pertinent part as follows:

(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment. . . .

*Id.* An "employer" is defined in 42 U.S.C. § 2000e(b) as a "person engaged in an industry affecting commerce who has fifteen or more employees. . . ." *Id.* An "employee" is simply "an individual employed by an employer. . . ." *Id.* at § 2000e(f).

13. Plaintiff acknowledged in his deposition that he has never been an employee of the Greater Southeast. *See* Dep. of Plaintiff, p. 481.

ship and privileges at Greater Southeast provide clear employment opportunities for practicing physicians. Dr. Johnson therefore concluded that he was entitled to protection under Title VII because control over the access to such employment opportunities lies squarely in the hands of the Hospital.

Dr. Johnson's attempt to align his claim with the claim upheld in *Sibley* is not persuasive because, unlike the nurse in *Sibley,* Dr. Johnson's relationship with his patients is not one of employment. In *Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C.Cir.1979), the court addressed the question of how employee status is determined under Title VII. Writing for the panel, Judge McGowan reasoned that the determination should turn on an "analysis of the 'economic realities' of the work relationship." *Id.* at 831. Judge McGowan elaborated on this analysis:

> This test calls for application of general principles of agency to undisputed or established facts. Consideration of all the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here.... If an employer has the right to control and direct the work of an individual, not only as to the result achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

*Id.* at 831—32 (footnotes omitted). It is beyond dispute that a patient does not control the "manner and means" of a physician's medical services. The practice of medicine is a highly specialized and skilled occupation. A patient simply cannot exercise the sort of detailed control over the "manner" of a physician's work that is normally found in an employer-employee relationship. The same is true for the "means" by which a physician practices medicine. Patients do not provide the equipment that is used by physicians in treating them. Patients do not provide physicians with the office space and examining rooms in which to practice.

■ The absence of such control suggest that the relationship between physician and patient is more aptly characterized as an independent contractor relationship. The lack of control over a contracted worker is the distinguishing feature of an independent contractor. According to the Restatement (Second) of Agency (1958), a servant [more recently termed "employee"] is "an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master." Id.* at § 2 (emphasis added). In contrast, an independent contractor is "a person who contracts to work with another to do something for him *but who is not controlled by the other nor subject to the other right of control with respect to his physical conduct in the performance of the undertaking." Id.* (emphasis added).

■ An analysis of the physician-patient relationship in light of the other evaluative criteria set forth in *Spirides* also point decidedly toward an independent contractor relationship. The court indicated that reviewing courts should consider: (1) the kind of occupation, and whether the work is supervised or conducted by a specialist without supervision; (2) the skill required to perform the work; (3) whether the "employer" or individual in question furnishes the equipment used and the place of work; (4) the length of time the person has worked; (5) the method of payment (i.e. by time or by the job); (6) the method by which the work relationship is terminated (i.e. by one or both parties, with or without notification and explanation); (7) whether worker is eligible for annual leave; (8) whether work is an integral part of the "employer's" business; (9) whether the work accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. *See Spirides, supra,* at 832.

An evaluation of the physician-patient relationship under these criteria indicates a classic independent contractor relationship: (1) a physician's work is normally conducted without supervision by the a patient; (2) the practice of medicine is a highly skilled and specialized profession; (3) neither the equipment nor the place of work is provided by the patient; (4) a physician's work with re-

spect to individual patients is usually brief and/or episodic; (5) the method of payment varies with patient and the particular services rendered; (6) the work relationship can be terminated at will by either the patient or the physician; (7) no annual leave is provided by the patient; (8) the services provided by the physician are typically not an integral part of the work of the patient; (9) the patient provides no retirement benefits for the physician; (10) the patient pays no social security taxes; and (11) patients generally do not intend to become a physician's employer. Since plaintiff's status is that of an independent contractor and *not* an employee, he may not invoke Title VII as a basis for his claim against the Hospital.[14]

Moreover, even if the law of agency was such that a physician could be construed as an employee of his patients, it is unclear under the facts of this case whether Greater Southeast's exercise of authority over the allocation of staff membership and hospital privileges at Greater Southeast sufficiently interfered with Dr. Johnson's ability to take on "employers"/patients so as merit coverage of Dr. Johnson's claims under Title VII. In *Sibley*, the hospital prevented plaintiff from entering into employment relationships with patients by blocking plaintiff's physical access to his potential employers. The hospital therefore had complete control over plaintiff's ability to secure potential employment. This is not true for Dr. Johnson. Unlike the nurse in *Sibley*, Dr. Johnson's access to potential patient-employers is not controlled by the Hospital. Greater Southeast may control the premises on which Dr. Johnson may wish to practice medicine, but the hospital has absolutely no control over Dr. Johnson's ability to secure patients and to enter into employment relationships with the patients. Although Medical Staff membership and hospital privileges at Greater Southeast certainly facilitate the doctor-patient relationship— particularly if patients prefer to be treated at Greater Southeast rather than some other

hospital—Greater Southeast, in its discretionary granting of membership and privileges, in no way robs Dr. Johnson of his ability to secure patients, or present them for treatment at other medical facilities.

■ It is also worth noting that a Title VII claim is *not* always cognizable where the defendant "control[s] access to *such employment.*" *Id.* at 1342 (emphasis added). Although "control" is an important aspect to be considered, it is neither the sole nor determinative factor as to whether a particular claim falls under the purview of Title VII. For example, a licensing board has the power to deny an applicant the ability to earn a living at his chosen profession. A licensing board, by its very existence, has complete control over access the regulated professional job market. Despite this control, such boards have been routinely held *not* to be employers. *See, e.g., Haddock v. Bd. of Dental Examiners,* 777 F.2d 462 (9th Cir.1985); *Woodard v. Virginia Bd. of Bar Examiners,* 598 F.2d 1345 (4th Cir.1979) (per curiam); *Tyler v. Vickery,* 517 F.2d 1089 (5th Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976); *Nat'l Org. for Women v. Waterfront Comm'n of New York Harbor,* 468 F.Supp. 317 (S.D.N.Y.1979).

Plaintiff's theory of Title VII coverage requires that he allege and prove some link between the defendants' actions and some employment relationship involving himself. Plaintiff has failed to make this connection. Plaintiff admitted that he was never an employee of Greater Southeast. Furthermore, no employer-employee relationship is implicated in physician's medical practice at Greater Southeast. Thus, defendants would be entitled to summary judgment on plaintiff's Title VII claim.

### 3. D.C. Human Rights Act Claims

■ Plaintiff alleged violations of the District of Columbia Human Rights Act,

---

**14.** Courts in other jurisdictions that have confronted this issue have reached the same conclusion. *See, e.g., Mitchell v. Frank R. Howard Memorial Hospital,* 853 F.2d 762 (9th Cir.1988), *cert. denied,* 489 U.S. 1013, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989) (holding that "as a matter of law [plaintiff's] allegations that the hospital inter-

fered with his relationships with his patients fail to state a claim for relief under Title VII."); *Beverley v. Douglas,* 591 F.Supp. 1321, 1328 (S.D.N.Y.1984) ("[A physician's] relationship to her patients is not that of employer and employee—and defendants accordingly are entitled to summary judgment on the Title VII claim.").

D.C.Code § 1–2512 (1981), based on the same set of facts. Like the federal civil rights laws, the District's statute outlaws employment discrimination and conspiracies to deprive persons of their rights. However, in light of the court's dismissal of plaintiff's federal claims, this court has no jurisdiction over plaintiff's municipal law claims. The only basis for this court's jurisdiction over plaintiff's D.C. Human Rights Act claims is the court's discretionary exercise of pendent jurisdiction. A federal court may exercise pendent jurisdiction over municipal law claims when such claims are so inextricably intertwined with the facts and circumstances giving rise to the federal claims that they "form part of the same case or controversy under Article III." 28 U.S.C. § 1367. However, in light of the court's decision to grant defendants' motions for summary judgment on all of plaintiff's federal claims, the court has no basis to exercise pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There must be a valid federal claim against each defendant for whom plaintiff seeks to present a claim of pendent jurisdiction under the D.C. Human Rights Act. *See, e.g., Brereton, supra; Byrd v. Pyle*, 728 F.Supp. 1 (D.D.C.1989); *Clifton Terrace Assoc. v. United Technologies*, 728 F.Supp. 24 (D.D.C. 1990), *aff'd in part and vacated in part*, 929 F.2d 714 (D.C.Cir.1991). With no such federal claims remain in the litigation, this court is prevented from exercising pendent jurisdiction over plaintiff's local claims. Accordingly, the court shall dismiss plaintiff's claims under the D.C. Human Rights Act for lack of jurisdiction.

*C. Tortious Inducement of Breach of Contract*

Plaintiff alleged that defendant Hinman "intentionally, willfully, and tortiously in-

duced a breach of contract between Plaintiff and Defendant Hospital in that he caused Defendant Hospital arbitrarily to terminate Plaintiff's Medical Staff membership and privileges." Complaint ¶ 68. Plaintiff's claim is grounded in the common law of tort, and as such, is a pendent claim in this federal litigation. In light of this court's decision to dismiss all of plaintiff's federal claims, this court has no basis to exercise subject matter jurisdiction over plaintiff's common law tort claim. *See United Mine Workers, supra.* Accordingly, plaintiff's tort claim against defendant Hinman shall be dismissed for lack of jurisdiction.[15]

### III.

### CONCLUSION

A separate Order summarizing all the above shall issue this date.

### *ORDER*

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Plaintiff's antitrust claims involving Greater Southeast Community Hospital ("Greater Southeast"), Johns Hopkins Health Plan ("Johns Hopkins"), and United Health Services contained in Counts I, II, and III of the Complaint are DISMISSED *sua sponte* for lack of ripeness.

2. All of defendants' pending motions for summary judgment on antitrust claims involving Greater Southeast, Johns Hopkins, and United Health Services are DISMISSED as moot.

---

**15.** Even if the court had jurisdiction to hear the matter, plaintiff's claim still fails as a matter of law because defendant Hinman engaged in his allegedly tortious conduct on behalf of Greater Southeast and therefore lacks the "third party" status required for this cause of action. *See Press v. Howard University*, 540 A.2d 733, 736 (D.C. 1988). In affirming the trial court's dismissal of plaintiff's tortious interference claim, the D.C. Court of Appeals stated:

[T]he individual defendants, all of whom were officers of the University, were acting as agents

of the other party to the contract, and ... the University through their actions could not tortiously interfere with its own contract.

*Id.* at 763. The court's decision in *Press* is supported by ample authority. *See Newman v. Legal Serv. Corp.*, 628 F.Supp. 535, 541 (D.D.C.1986); *Donohoe v. Watt*, 546 F.Supp. 753, 757 (D.D.C. 1982), *aff'd*, 713 F.2d 864 (1983); *Wilmington Trust Co. v. Clark*, 289 Md. 313, 327–30, 424 A.2d 744, 754–55 (1981); *W. Keeton, Prosser and Keeton on the Law of Torts* § 129, at 990 (5th Ed.1984).

3. Defendants' motion for summary judgment on plaintiff's antitrust claims involving Columbia Hospital for Women Medical Center ("Columbia Hospital") contained in Count I of the Complaint is GRANTED.

4. Plaintiff's antitrust claims involving Columbia Hospital are DISMISSED with prejudice.

5. Plaintiff's motion for issuance of a trifurcated briefing schedule and enlargement of time in which to respond to defendants' motions for summary judgment is DENIED.

6. Plaintiff's motion for leave to file an opposition to defendants' motion for summary judgment on civil rights claims out of time is DENIED.

7. Defendants' motion to strike plaintiff's opposition to defendants' motion for summary judgment on civil rights claims and all accompanying papers filed out of time is DENIED as moot.

8. Defendants' unopposed motion for summary judgment on all civil rights claims (Counts IV and V of the Complaint) is GRANTED as conceded pursuant to local rule 108(b).

9. Plaintiff's civil rights claims (Counts IV and V of the Complaint) are DISMISSED with prejudice.

10. Plaintiff's tort claim against defendant Hinman (Count VI of the Complaint) is DISMISSED for lack of subject matter jurisdiction.

Accordingly, this entire case now stands DISMISSED.

SO ORDERED.