686 A.2d 706

**STATE OF MARYLAND COMMISSION ON HUMAN RELATIONS,**

v.

**SUBURBAN HOSPITAL, INC.**

No. 424, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Dec. 26, 1996.

Lee D. Hoshall, Assistant General Counsel (Glendora C. Hughes, General Counsel, on the brief), Baltimore, for appellant.

Pamela J. Moore, Morristown (Littler, Mendelson, Fastiff, Tichy & Mathiason, Morristown, S. Allan Adelman and Godard, West & Adelman, Rockville, on the brief), for appellee.

Argued before CATHELL, DAVIS, and EYLER, JJ.

DAVIS, Judge.

The Maryland Commission on Human Relations (Commission) filed a complaint for injunctive relief pursuant to Maryland Code (1957, 1994 Repl. Vol), Article 49B, § 4. The Commission sought to prohibit appellee Suburban Hospital (Suburban) from voting to revoke the hospital staff privileges of Dr. Carol Bender, and from taking "any further actions to terminate, suspend or restrict" her privileges, until a hearing on the merits of an interlocutory injunction or until the conclusion of administrative proceedings pertaining to Dr. Bender's charge of unlawful sex discrimination under the Maryland Fair Employment Practices Act (FEPA), Article 49B, §§ 14 *et seq.* The administrative charges are currently pending before the State Office of Administrative Hearings. The circuit court denied the request without a hearing by its

order of February 21, 1996. That same day, the Commission noted its appeal. On appeal, the parties present the following questions for our review:

I. Is the issue of the denial of *ex parte* relief moot?

II. Is review of the interlocutory relief issue moot?

III. Did the circuit court abuse its discretion in refusing to issue an *ex parte* injunction?

IV. Should the Commission's request for review of a denial of interlocutory injunctive relief be denied because the circuit court did not rule on a request for interlocutory relief?

V. Did the circuit court abuse its discretion in refusing to issue an interlocutory injunction? [1]

We answer the first and fourth questions in the affirmative, and the second in the negative. We address the fifth question in order to avoid a second appeal to this Court, and do not reach the third question. Accordingly, we dismiss the appeal.

## FACTS

Beginning in 1977, Dr. Carol Bender has practiced general internal medicine in Rockville. For most of this period, she has held medical staff privileges at Suburban Hospital, enabling her to admit patients and to provide medical treatment while they are hospitalized. She has also provided coverage for other physicians with privileges at Suburban. As a result of the circumstances surrounding the controversy before us, Dr. Bender no longer holds staff privileges at the hospital. She still maintains a separate office practice and admitting privileges at Shady Grove Hospital.

Suburban follows the unusual practice of encouraging patients and staff at the hospital to complete reports on any negative incident involving a staff member. Reports on a particular individual's behavior are placed in his or her perma-

---

1. The first, second, and fourth issues were presented by Suburban, with the other two issues presented by the Commission.

nent file. Affidavits submitted to the circuit court reveal that this practice is highly unusual, even unique, among area hospitals.

Dr. Bender has accumulated what no one disputes is a rather thick file of these "incident reports," dating from 1981. An exhaustive list of the reports is unnecessary here, but most of them concern Dr. Bender's interpersonal interaction with other doctors, nurses, other medical personnel, and patients, rather than her clinical performance or skills as a physician. Specifically, most of the reports accused her, *inter alia,* of making rounds in casual attire and bringing her children to work, of engaging in rude, profane, and abusive behavior toward other doctors, nurses, and patients, and of openly criticizing, in an abusive manner, the care provided to her patients by other doctors or staff. Following discussions with hospital administrative personnel about some of these incidents, Dr. Bender accumulated no more reports in her file for three years after 1988. Three reported incidents in 1991 and 1992, however, provoked the Suburban Hospital Credentials Committee to review her application for reappointment to the active staff of the hospital for the years 1993–94.

At the center of the dispute on the merits, aside from the issues central to this appeal, is the motive for Suburban's actions taken in response to the incident reports. The Credentials Committee, in a meeting held January 28, 1993, voted to require Dr. Bender to undergo a psychiatric evaluation at the hospital's expense, by a psychiatrist of the hospital's choice, as a condition precedent to reappointment. Dr. Bender agreed to an examination, and the examining psychiatrist, Dr. William E. Flynn, submitted his report on March 10, 1993. In the report, Dr. Flynn diagnosed no psychiatric illness, but concluded that Dr. Bender was "a person who has not developed a sensitivity to the reactions of her coworkers and therefore does not attempt to control her own responses to frustration." Dr. Flynn recommended that the Credentials Committee require Dr. Bender to undergo psychotherapy "aimed at insight and behavior change," at her own expense. A consultant should evaluate Dr. Bender's progress semi-

annually, and should Dr. Bender refuse treatment or should therapy not produce favorable results, Dr. Flynn concluded, the Credentials Committee should impose sanctions.[2] After a personal interview with Dr. Bender in a special meeting held on April 15, 1993, the Credentials Committee submitted its recommendation to the Executive Committee. It adopted Dr. Flynn's advice that Dr. Bender should be reappointed provided she undergo behavioral counseling and therapy aimed at improving her interpersonal interactions. Suburban's Medical Staff Executive Committee adopted the recommendation of the Credentials Committee on May 4, 1993.

Dr. Bender refused to undergo the counseling and therapy. Instead, she filed a charge of sex discrimination with the Commission, claiming the hospital was singling her out because of her gender. The foundation for her allegations consisted of the alleged triviality of the incidents reported, as well as reports of disruptive behavior on the part of male doctors among the staff at Suburban which had gone, Dr. Bender asserted, largely ignored and unpunished. In support of her arguments, Dr. Bender produced affidavits in the circuit court from several witnesses attesting that several male doctors have been extremely rude and abrasive to patients and staff, have used foul language, and have dressed casually and brought their children to the hospital with them on their rounds, all without serious consequences to the doctors. One of the affidavits came from one such male doctor. Another affidavit came from a nurse at Suburban.

Simultaneously, Dr. Bender sought review of Dr. Flynn's recommendation through the peer review process contained in the Medical Staff By–Laws for Suburban. Because of scheduling difficulties, the peer review hearings did not begin until January 1994. The peer review Hearing Committee, after eight days of testimony spaced over seven months, affirmed the recommendation of the Executive Committee on January

---

**2.** Dr. Bender subsequently underwent an examination by two psychiatrists of her choice. Both diagnosed no psychiatric illness and concluded that Dr. Bender needed no treatment.

26, 1995, recommending, however, that Dr. Bender merely undergo "behavioral counseling" rather than therapy.

In the intervening two years between the Executive Committee's recommendation (based upon Dr. Flynn's psychiatric evaluation) and the decision of the Hearing Committee, there were no reports of behavioral problems on the part of Dr. Bender. Based upon this development, the Executive Committee recommended on April 7, 1995 that Dr. Bender be reappointed without the requirement of behavioral counseling, provided that she agreed to release Suburban and everyone associated with Suburban from "any claims she might have, including claims relating to sex discrimination, as [a] result of any events which have transpired to date." Dr. Bender agreed to this condition at first, but for reasons both unclear and irrelevant, later changed her mind. She informed the Executive Committee, through her attorney, that "as a result of the fact that she has no executed agreement, [Dr. Bender] hereby withdraws her previous settlement offer."

Based on this new position, the Suburban Medical Staff Executive Committee reconsidered its earlier reappointment recommendation. Finding its earlier recommendation of behavioral counseling "reasonable and appropriate," it concluded that further efforts by the hospital to resolve the situation would prove unproductive. On May 4, 1995, the Executive Committee recommended, by a vote of twelve to four, that the Board of Trustees not reappoint Dr. Bender to the Medical Staff. An agreement authorizing the Commission to conduct an investigation into the matter forestalled further action, however. It also gave Suburban an opportunity to respond to Dr. Bender's challenge of sex discrimination, in exchange for Suburban's agreement to maintain Dr. Bender's staff privileges until the Commission's investigation had concluded.

Pursuant to its agreement, the Board of Trustees of Suburban issued a temporary extension of Dr. Bender's privileges, which would expire on February 29, 1996. On November 15, 1995, after an investigation into the matter, the Commission issued a finding of probable cause that sex discrimination had occurred. In its written findings, the Commission determined

that male physicians exhibiting similar conduct generally were not disciplined as severely as Dr. Bender; furthermore, those few doctors who had had their privileges suspended or had been required to undergo therapy "appeared to be disposed to possible endangerment to patients and were generally already under psychiatric care prior to any *ad hoc* / board / credentials committee determination that they be required to do the same." Stating that several male doctors had engaged in similar conduct with no adverse consequences or even incident reports, and that Suburban admitted that Dr. Bender's clinical competence was not at issue, the Commission referred the matter to a Commission conciliator pursuant to COMAR 14.03.01.07A.

On February 19, 1996, two days before the Board of Trustees was to vote on Dr. Bender's application for reappointment, the Commission filed a Complaint for *Ex Parte* and Interlocutory Injunctive Relief in the circuit court, along with a proposed order, which was denied on February 21, 1996. On that day, the Board met as scheduled and denied Dr. Bender's application for reappointment. As of February 26, 1996, Dr. Bender has not been affiliated with Suburban.

Suburban does not pay a salary or a stipend to physicians with voluntary staff privileges, such as Dr. Bender. It does pay such salaries or stipends to hospital physicians holding certain specialties, to physicians holding certain administrative and management positions, to physicians employed by organizations that have contracts to run certain operations (such as the emergency room), and to those physicians whose private medical practices have been purchased by Suburban. Suburban provides several ancillary benefits to physicians such as Dr. Bender, including facilities with which to care for patients, staff services at the hospital, and various fringe benefits such as seminars, cafeteria discounts, and a physicians' lounge.

Suburban does not pay social security taxes for Dr. Bender, and she is not covered under Suburban's malpractice insurance. Suburban does not pay Dr. Bender's licensing fees, professional dues or taxes. It does require that physicians who wish to take a leave of absence from their duties submit a

request for leave to Suburban. In addition, physicians must notify Suburban if they have an illness that will cause at least a month's absence. Physicians must also conform with Suburban's general record-keeping and reporting requirements. In addition, physicians on the "active" staff must attend fifty percent of the combined number of meetings held by the Medical Staff, department, subsection, and committee to which the physician is assigned. Active staff physicians must also satisfy ancillary activity requirements determined by the Medical Staff Executive Committee.

Suburban's by-laws specify that a physician may request placement on an on-call roster to care for emergency patients or interpret test results. Suburban exercises the right to control placement on, or removal from, the on-call roster. Suburban also runs a physician referral service. Patients are referred to physicians on Suburban's medical staff for treatment, and, if necessary, that physician may admit them to Suburban for treatment.

Suburban does not supervise the care given to these or any other patients under the care of a voluntary staff physician, although it reserves the right to prohibit certain treatment deemed "medically unacceptable" by Suburban. In an affidavit submitted in the circuit court, however, Dr. Bender claimed that "on occasion," she has been removed from patient care by her "supervisors" in response to a request by another physician, without regard to the patient's wishes. Dr. Bender also has agreements with three other physicians under which she "covers" for them at the hospital when they are unable to care for their patients. Her coverage physicians participate in Preferred Provider Organizations (PPO's) which require them to have privileges at Suburban.

### DISCUSSION

#### A

##### I

Suburban argues that the issues raised by the Commission are moot and that we should therefore dismiss the

appeal. Suburban cites *National Collegiate Athletic Ass'n v. Tucker*, 300 Md. 156, 476 A.2d 1160 (1984), and *General Motors Corp. v. Koscielski*, 80 Md.App. 453, 564 A.2d 114 (1989), for the proposition that an appeal of a denial of an injunction is moot when the act sought to be enjoined has already occurred. *Tucker*, 300 Md. at 159, 476 A.2d 1160; *Koscielski*, 80 Md.App. at 457, 564 A.2d 114. The Commission, argues Suburban, sought to enjoin the Board of Trustees from voting to deny Dr. Bender's application for reappointment. Because the denial of the injunction enabled the Board to act, Suburban concludes, and because the Board has already acted to deny Dr. Bender's application, there is nothing for us to enjoin and we should dismiss the appeal.

We disagree on two levels. First, Suburban's reliance on *Tucker* and *Koscielski* is misplaced. As the Court of Appeals recently reiterated in *Insurance Comm'r v. Equitable Life Assurance Soc'y of the United States*, 339 Md. 596, 664 A.2d 862 (1995): " 'A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.' " *Id.* at 613, 664 A.2d 862 (quoting *Att'y General v. Anne Arundel County School Bus Contractors Ass'n*, 286 Md. 324, 327, 407 A.2d 749 (1979)). The doctrine of mootness "applies to situations in which 'past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter would be without effect.' " *Md. Comm'n on Human Relations v. Downey Communs., Inc.*, 110 Md.App. 493, 512, 678 A.2d 55 (1996) (quoting *Hayman v. St. Martin's Evangelical Lutheran Church*, 227 Md. 338, 343, 176 A.2d 772 (1962)). The usual result of an appeal deemed moot is dismissal. *Downey Communs.*, 110 Md.App. at 513, 678 A.2d 55.

In *Tucker*, the NCAA had appealed the circuit court's grant of an injunction prohibiting the NCAA and Johns Hopkins University from barring two lacrosse players from playing in the final two games of the season. By the time the appeal was

heard, the games were over and the athletes had played. In dismissing the appeal, the Court of Appeals noted:

> In the instant appeal, a controversy no longer exists over whether the appellees will be allowed to play lacrosse for the remainder of the season because, simply put, the season is over. Accordingly, because the only question before us is the appropriateness of the issuance of the interlocutory injunction, we hold that the appeal is moot.

*Tucker,* 300 Md. at 159, 476 A.2d 1160.

In *Koscielski,* we were faced with a somewhat different situation. In that case, we declared moot a request to stay a circuit court's order for payment of attorney's fees to Koscielski's attorney in a workers' compensation case, because payment had already been made prior to our hearing the case. Relying on the particular language of the court's order, that "[t]he monies deposited in the circuit court by the appellant . . . be paid to [appellant's attorney] at 2 p.m. on Wednesday, January 25, 1989 . . . .", we noted that the "sum has been paid to appellee's counsel and, thus, the actual payment to and receipt by appellee's counsel *is a matter which the courts can no longer control." Koscielski,* 80 Md.App. at 457, 564 A.2d 114.

In response to the Commission's argument that we should reverse the effects of the Board's vote pending the outcome of the administrative hearing, Suburban argues that this would accomplish nothing. To support this assertion, Suburban relies on the following *dicta* from our opinion in *Koscielski:*

> While it is arguable that we could order the return of the fee to the Clerk of the Court pending trial on the merits of the disputed attorney's fees, the posture of the case and common sense [dictate] otherwise. If the appellee prevails, the monies would then, for a second time, be paid to her attorney.

*Id.* at 458, 564 A.2d 114. Because the Board's vote has occurred, says Suburban, and because reinstatement is a remedy to which Dr. Bender may be entitled should she

prevail on the merits of her discrimination claim, common sense dictates the dismissal of the appeal.

We disagree. Injunctive relief is an equitable remedy, *see Fox v. Ewers,* 195 Md. 650, 657, 75 A.2d 357 (1950), and is governed, as is all equitable relief, by basic notions of fairness. We relied in *Koscielski* on the "posture of the case and common sense" in declining to order the return of the fee to the Clerk of the Court, pending trial on the merits of the disputed attorney's fees. *Koscielski,* 80 Md.App. at 458, 564 A.2d 114. First, the posture of that case is that it was an appeal for a stay of an order already executed. There was nothing to stay. Moreover, we think it significant that in that case, the relief sought would be of minimal benefit to the appellant himself. Had we ordered the return of the money, the appellant would have received nothing. The only effect would have been the return of the money to the Clerk of the Circuit Court, soon to be paid either to the appellant or to his attorney. Such a purely ministerial act would have been meaningless. Put another way, granting the stay at issue in *Koscielski* would not have been an "effective remedy" of the sort contemplated by *Anne Arundel County School Bus;* it would not have relieved any hardship personal to appellant, who, in either event, would remain without the money until the conclusion of the trial.

*Koscielski,* however, is distinguishable from the case *sub judice* in that temporary reinstatement of Dr. Bender's privileges at Suburban, pending the outcome of her administrative hearing, would garner benefits of tremendous pecuniary and nonpecuniary value for her. She would be able to admit her patients to the hospital for treatment, thus stemming the attrition of patients and the rapid loss of income that the Commission alleges is occurring.[3] "It has long been

---

3. In its reply brief to this Court, the Commission alleges that, as a direct result of the hospital's actions, Dr. Bender has "lost patients to other physicians, has lost patients who required follow-up after hospitalization, and has lost additional income from the loss of her coverage relationships with other doctors and loss of referral consultations." In

established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the *status quo*." *Porter v. Lee*, 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1946). The *status quo* to be preserved by a preliminary injunction is "the last, actual, peaceable, noncontested status which preceded the pending controversy." *State Dep't of Health & Mental Hygiene v. Baltimore County*, 281 Md. 548, 556 n. 9, 383 A.2d 51 (1977) (quoting 43 C.J.S. *Injunctions* § 17 (1945)). The last noncontested status of Dr. Bender was as a physician with staff privileges at Suburban.

Moreover, temporarily reversing the Board's action would be perfectly consistent with the purpose of the General Assembly in enacting Article 49B, § 4. Section 4 was enacted substantially to eliminate the need for damages for lost wages "by authorizing instead interlocutory injunctive relief *in order that the status of the parties be preserved* pending a determination on the merits." *State Comm'n on Human Relations v. Amecon Div. of Litton Systems, Inc.*, 278 Md. 120, 125, 360 A.2d 1 (1976) (emphasis added). Were we to grant the injunction, we would be preserving the status of the parties until the administrative hearings conclude. Thus, the case still presents a live controversy for which a court could fashion an effective remedy. *Downey Communs.*, 110 Md.App. at 513–14, 678 A.2d 55.

■ Therefore, we hold that the appeal concerning an *interlocutory* injunction is not moot. We believe, however, that under *Koscielski*, the appeal from the denial of an *ex parte* injunction *is* moot. The Commission asked the circuit court for an *ex parte* injunction pending a hearing on the propriety of an interlocutory injunction to remain in effect until the resolution of the administrative proceedings. MARY-LAND RULE BB72 governs the issuance of *ex parte* injunctions:

---

a June 20, 1996 affidavit, Dr. Bender estimated her loss of income for an entire year due to the hospital's actions to be approximately $30,000. For the purpose of determining whether the issue is moot, we will accept these assertions at face value.

### a. *When May Be Granted*

Any *ex parte* injunction shall not be granted unless it appears from specific facts ... that *immediate, substantial and irreparable injury* will result to the applicant *before an adversary hearing may be had.*

Approximately ten months have passed since the denial of Dr. Bender's application for reappointment. We think it fairly obvious that no damage would result, which has not resulted already, from requiring Dr. Bender to wait the relatively short time it would take to hold a hearing on the merits of a complaint for an interlocutory injunction. In short, to grant an *ex parte* injunction until such time as a hearing for an interlocutory injunction may be held, at this late date, would run contrary to "the posture of the case and common sense." *Koscielski,* 80 Md.App. at 458, 564 A.2d 114. Frankly, any injury so immediate as to justify the issuance of an *ex parte* injunction at the time of the circuit court's denial has already occurred, or was never a threat in the first place. An adversary hearing could have taken place many months ago. Therefore, we can offer no effective remedy by considering the propriety of the denial, and this issue is moot. On appeal, therefore, we will only consider the request for an interlocutory injunction.

## II

We turn now to the question of the interlocutory injunction. Suburban argues that the circuit court denied only the request for an *ex parte* injunction; the denial did not extend to a request for interlocutory injunctive relief. We agree. Our opinion in *Downey Communs.* provides ample support for this conclusion. In that case, as here, the Commission sought both *ex parte* and interlocutory injunctive relief. *Downey Communs.,* 110 Md.App. at 518, 678 A.2d 55. The circuit court in *Downey Communs.* stated explicitly in its order that it considered "Plaintiff's Petition for Ex Parte[,] Interlocutory[,] and

Permanent Injunctive Relief." Despite this explicit reference, we found that the court's order only denied *ex parte* relief. *Id.*

We will first address two differences between that case and the case *sub judice*, which may at first blush appear to support the Commission's argument that the circuit court ruled on a request for interlocutory injunctive relief. In *Downey Communs.*, the language of the court's order specified that "because [the court] was 'not . . . satisfied that the burden has been shown,' 'Plaintiff's *ex parte* petition is DENIED.' (Italics added; capitalization in original)." *Id.* In addition, the docket entries in that case stated that an order denying the appellant's "*ex parte* petition" was filed. This specific language in the court's order and the docket entries provided support for the conclusion that the circuit court meant only to deny the request for an *ex parte* injunction.

In the case *sub judice*, the docket entry does state that the order of the court "denying" the complaint for *ex parte* injunction and interlocutory relief was filed. The court did not issue its own written order, however, but adopted the Commission's proposed order. There is no positive language of the court such as existed in *Downey Communs.* Nevertheless, two other factors convince us that the court denied only a motion for *ex parte* injunctive relief.

First, as stated *supra*, the court merely scrawled "Denied" on the copy of the proposed order submitted by the Commission. This proposed order reads:

Plaintiff's Complaint for Ex Parte and Interlocutory Injunctive Relief, having come before this Court, and having considered Plaintiff's Complaint and Defendant's [sic] Opposition thereto,

It is hereby *ORDERED*, this 20th day of February, 1996

A. A temporary injunction is issued, effective immediately, enjoining the Defendant [sic] from taking any action to terminate, suspend or restrict Plaintiff's reappointment to the Hospital, or her staff privileges, and requiring the defendant to maintain the status quo;

B. That this injunction shall remain in effect until _____ or until such time as the Court holds an evidentiary hearing on this matter and has had an opportunity to rule or until the completion of administrative proceedings before the Office of Administrative Hearings.

We note first that the words "Plaintiff's Complaint for Ex Parte and Interlocutory Injunctive Relief," found at the top of the order, are not dispositive. In *Downey Communs.*, the order written by the court contained the same title, yet we found that the court only ruled on the *ex parte* request. *Downey Communs.*, 110 Md.App. at 518, 678 A.2d 55.

Most important, however, we look at the language of the document itself. Court orders are construed in the same manner as other written documents. *Id.; Hosain v. Malik*, 108 Md.App. 284, 310–11, 671 A.2d 988 (1996).[4] The requested time frame for the injunction, in paragraph B, specifies a blank date, a short time until an interlocutory hearing, or, in the alternative, a time stretching until the completion of administrative proceedings. This request can only relate to an *ex parte* injunction. The blank date is a nullity. The request for an injunction *to take effect "until such time as the Court holds an evidentiary hearing on the matter and has had a chance to rule"* is self-explanatory, and is obviously a request for an *ex parte* injunction. Furthermore, the last alternative is to extend the injunction until the completion of the administrative proceedings. This last alternative, by its very terms, contemplates no hearing. No injunction other than an *ex parte* injunction can issue without notice and an opportunity for the adverse party to be heard on the propriety of the injunction. *See* MD. RULE BB74 (1996). The Commission was asking the circuit court to grant an interlocutory injunction without a hearing, which it could never do.

Thus, the injunction which the proposed order grants, and upon which the court wrote its denial, contained, by its own

---

4. Although this is not strictly a "court order," but rather a denial of a proposed order, the court adopted the proposed order for the purposes of denying (or dismissing) the complaint.

terms, a grant only of an *ex parte* injunction. Furthermore, as we noted in *Downey Communs.:*

> In reaching our conclusion as to the scope of the court's ruling, we also consider the circumstances under which the court signed the order. The judge executed the order after a chambers conference conducted on the same day on which the Commission filed its petition—a time frame and meeting place that are consistent with a ruling on an *ex parte* injunction. *Furthermore, and most notably, no adversary hearing was ever conducted in open court, and no proceedings took place at which evidence was introduced.*

*Downey Communs.,* 110 Md.App. at 518, 678 A.2d 55 (emphasis added). In this case, no adversary hearing was ever conducted—not even a chambers conference—and no proceedings took place at which evidence was introduced. Moreover, the date on the proposed order was February 20th, 1996—one day after the proposed order was submitted to the circuit court. Clearly, the Commission did not contemplate a hearing when it submitted its order, but an emergency, *ex parte* injunction, *pending* a hearing or, if one were never held, pending the outcome of the administrative proceeding. Thus, the court denied a request only for *ex parte* injunctive relief. It never ruled on a request for interlocutory injunctive relief, and we must dismiss this appeal as premature.

## B

Our analysis, *supra,* does not dispose of this case, however. The result of our dismissal of the appeal regarding the Complaint for Interlocutory Injunctive Relief would logically be a hearing on the merits of such relief in the circuit court. If the court failed to grant an interlocutory injunction mandating temporary reinstatement of Dr. Bender's staff privileges at Suburban, then the Commission may appeal to this Court again, and its argument would necessarily have to be that the circuit court abused its discretion in failing to grant an interlocutory injunction. *See Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.,* 92 Md.App. 267, 272, 607 A.2d 584, *cert. denied,* 328 Md. 237, 614 A.2d 83 (1992) (the exercise of

discretion by the trial court when it denies an injunction will not be disturbed on appeal absent a showing that discretion has been abused). This would put us in the same position as we are in today. Thus, in order to spare all concerned the expense and delay of another appeal, MD. RULE 8–131(a) (1996), we will address the Commission's main contention (modified in light of the posture of the case): whether the circuit court could have granted an interlocutory injunction under the facts presented by the Commission. In short, we must decide, as a matter of law, whether the circuit court could exercise its discretion in favor of the Commission, and mandate the temporary reinstatement of Dr. Bender's privileges.

# I

A party requesting an injunction must show that it "has a real probability of prevailing on the merits...." *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 456, 654 A.2d 449 (1995). As the Commission concedes, in this case, this requires a showing that FEPA applies to dealings between Dr. Bender and Suburban. Section 16(a)(1) provides:

(a) It shall be an unlawful employment practice for an employer:

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

Section 15(b) sets forth the Act's definition of the terms "employer" and "employee," reproduced below in relevant part:

For the purposes of this subtitle:

(b) *Employer.*—The term "employer" means a person engaged in an industry or business who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....

(e) *Employee.*—The term "employee" means an individual employed by an employer....

Both parties agree that FEPA only forbids discrimination affecting an employment relationship. They differ, however, on the nature and extent of the relationship sufficient to form the basis of a FEPA claim. The Commission first argues that an employment relationship exists between Dr. Bender and the hospital, thus bringing Suburban's actions within the scope of FEPA. Suburban argues that Dr. Bender is an independent contractor and thus outside the scope of FEPA's protection.

 We note at the outset that we have the discretion to rule only on matters of law in determining whether an employment relationship exists. Where the facts of a case are undisputed, we may rule on the inferences to be drawn from the facts as a matter of law, but when facts underlying the resolution of the question are themselves in dispute, we must remand the case to the trial court for the necessary factual findings. *Whitehead v. Safway Steel Products, Inc.,* 304 Md. 67, 75–76, 497 A.2d 803 (1985). In order to resolve this issue as a matter of law, we will resolve all possible disputes in favor of the Commission.

The issue of whether a doctor who has been denied staff privileges at a hospital has a colorable claim under Article 49B is one of first impression in Maryland. Furthermore, no Maryland case has determined the relationship between a doctor and a hospital at which he or she has privileges. We will begin our discussion by examining the Maryland common law of employment relationships; then we will move beyond the common law as this case requires.

 In Maryland, at common law, employees are always agents of the principal, but not all agents are employees. *Patten v. Board of Liquor License Comm'rs.,* 107 Md.App. 224, 238, 667 A.2d 940 (1995); *Sanders v. Rowan,* 61 Md.App. 40, 50, 484 A.2d 1023 (1984) ("Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not

servants.").[5] Agents who are not employees are independent contractors. *Id.; Brady v. Ralph Parsons Co.,* 308 Md. 486, 510, 520 A.2d 717 (1987).[6] At common law, then, a finding of agency must precede an analysis of whether a person is an employee of another. *State v. Cottman Transmissions,* 86 Md.App. 714, 733, 587 A.2d 1190, *cert. denied,* 324 Md. 121, 596 A.2d 627 (1991). In *Schear v. Motel Management Corp.,* 61 Md.App. 670, 487 A.2d 1240 (1985), we set forth the test for the existence of an agency relationship which has guided our analysis in subsequent cases:

> There are three elements that are integral to an agency relationship: (1) The agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal.

*Id.* at 687, 487 A.2d 1240 (citing *Restatement (Second) of Agency* §§ 12–14 (1958)); *Patten,* 107 Md.App. at 238, 667 A.2d 940; *Mercedes–Benz of N. Am. v. Garten,* 94 Md.App. 547, 557, 618 A.2d 233 (1993); *Homa v. Friendly Mobile Manor,* 93 Md.App. 337, 360, 612 A.2d 322 (1992), *appeal dismissed without op.,* 330 Md. 318, 624 A.2d 490 (1993); *Cottman Transmissions,* 86 Md.App. at 732, 587 A.2d 1190.

After finding that an agency relationship exists, a court then applies five criteria to determine whether the relationship is that of an employer and employee. *Whitehead,* 304 Md. at 77, 497 A.2d 803. These are: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer. *Id.* at 77–78, 497 A.2d 803. The key factor, with conclusive significance, is the power or right

---

**5.** The test of an employer/employee relationship is derived from the common law standard for determining the master/servant relationship. *Whitehead,* 304 Md. at 77, 497 A.2d 803. The two terms are interchangeable.

**6.** Not all independent contractors are agents, however. *Brady,* 308 Md. at 510 n. 26, 520 A.2d 717.

of control. *Id.* at 78, 497 A.2d 803; *Chevron, U.S.A., Inc. v. Lesch,* 319 Md. 25, 32, 570 A.2d 840 (1990); *Brady,* 308 Md. at 510 n. 25, 520 A.2d 717; *Imbraguglio v. Great Atl. & Pac. Tea Co.,* 108 Md.App. 151, 160, 671 A.2d 72, *cert. granted,* 342 Md. 507, 677 A.2d 583 (1996); *Travelers Indem. Co. v. Insurance Co. of North America,* 69 Md.App. 664, 675, 519 A.2d 760 (1987). If the right of control is not present, and the worker is free to perform the work "according to his own means and methods free from control of his employer in all details connected with the performance of the work except as to its product or result," then the worker is an independent contractor. *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md.App. 145, 180, 620 A.2d 356 (1993) (quoting *Williams Constr. Co. v. Bohlen,* 189 Md. 576, 580, 56 A.2d 694 (1948)).[7]

That is the Maryland common law approach to agency and employment relationships, which Suburban urges us to adopt in light of the United States Supreme Court's decision in *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). In that case, the Court, noting the lack of any legislative guidance as to the meaning of the term "employee" under the Employee Retirement Income Security Act of 1974 (ERISA),[8] resorted to traditional agency law principles to divine the meaning of the term.[9] We view

---

7. We note that not every fiduciary relationship is an agency relationship, much less an employment relationship. *See Patten,* 107 Md.App. at 238, 667 A.2d 940. For example, attorneys are ordinarily considered independent contractors for their clients. *Brady,* 308 Md. at 510 n. 27, 520 A.2d 717; *Henley v. Prince George's County,* 305 Md. 320, 340 n. 5, 503 A.2d 1333 (1986). We have held, however, that an attorney *may* be a client's employee if the required criteria are met. *Baker, Watts & Co.,* 95 Md.App. at 180, 620 A.2d 356.

8. ERISA contained the same definition of "employee" as FEPA: "an individual employed by an employer." 29 U.S.C. § 1002(6) (1974). *Compare* FEPA § 15(c) (same). As the Supreme Court said, this "nominal definition" is "completely circular and explains nothing." *Darden,* 503 U.S. at 323, 112 S.Ct. at 1348.

9. Suburban urges us to apply the common law agency test used by the Supreme Court in *Darden,* a complex process which we need not detail here. By arguing for the application of this test, Suburban overlooks

this approach as inapposite to the analysis of the meaning of "employee" under Article 49B, and we decline to adopt it.

First, we note that the Court rejected a broader reading of the term "employee" because Darden and the United States (as *amicus curiae*) attempted to apply a definition of the term drawn from the Fair Labor Standards Act, which defined the verb "employ" to include "suffer or permit to work." "The textual asymmetry between the two statutes," the Court said, prevented this approach. *Id.* at 326, 112 S.Ct. at 1350. The Commission attempts no such application in this case, but relies for its argument solely on the remedial nature of FEPA and federal case law interpreting Title VII of the Civil Rights Act.

Second, although we note the similarity of the definitions of "employee" in ERISA and FEPA, we see no reason to adopt the Supreme Court's direction based solely on this. More compelling, we believe, is the practice of Maryland courts to look to federal case law and legislative history relating to Title VII in order to interpret FEPA, in light of the identity of language between many sections of the two acts, including the sections at issue in the case *sub judice*. *Molesworth v. Brandon*, 341 Md. 621, 633, 672 A.2d 608 (1996) (Article 49B was modeled on Title VII, and has been altered to conform to the federal act); *Brandon v. Molesworth*, 104 Md.App. 167, 186 n. 16, 655 A.2d 1292 (1995). We shall do the same.

In light of its specific reasons for rejecting a broad definition of "employee" under ERISA, the Supreme Court's approach in *Darden* does not vitiate its own earlier pronouncement that the common law "right to control" test was too rigid to serve as a useful tool in deciding employee status in cases arising under remedial social legislation. *Bartels v. Birming-*

the Court's acknowledgement that this approach, in federal cases, incorporates " 'the general common law of agency, rather than ... the law of any particular State.' " *Darden*, 503 U.S. at 323 n. 3, 112 S.Ct. at 1348 n. 3 (quoted source omitted). We are construing Maryland law, however, not a federal statute. Were we to take the *Darden* approach, the common law of Maryland, as discussed *supra*, would apply.

*ham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947) ("Obviously control is characteristically associated with the employer-employee relationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service."). Following the lead of *Bartels,* most federal circuits, including the Fourth Circuit, have recognized that in enacting Title VII, Congress "sought to eliminate a pervasive, objectionable history of denying or limiting one's livelihood simply because of one's race, color, sex, religion or national origin." *Haavistola v. Community Fire Co.,* 6 F.3d 211, 221 (4th Cir.1993) (quoted source omitted). Consequently, these circuits have applied a test under Title VII that finds a place for the notion that the "economic realities" of the workplace should play a significant part in determining whether someone is an "employee" for purposes of Title VII. *Id.;* *e.g., Diggs v. Harris Hospital–Methodist,* 847 F.2d 270, 272 (5th Cir.1988); *Garrett v. Phillips Mills, Inc.,* 721 F.2d 979, 981 (4th Cir.1983); *Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C.Cir.1979).

▇▇▇ Most circuits, however, have not adopted the "pure" economic realities test, an expansive standard used under the Fair Labor Standards Act. This test deems persons employees if, as a matter of economic reality, they depend upon the business they serve. *E.E.O.C. v. Dowd & Dowd, Ltd.,* 736 F.2d 1177, 1178 (7th Cir.1984) (recognizing the "economic realities" test for Title VII). Rather, most circuits apply a test first set forth by the United States Court of Appeals for the District of Columbia Circuit in *Spirides,* 613 F.2d at 831, which combines the common law of agency with the recognition of the economic realities of the workplace:

Rather, determination of whether an individual is an employee or an independent contractor for purposes of the Act involves ... analysis of the "economic realities" of the work relationship. This test calls for application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the relationship is essential, and no one factor is determina-

tive. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law and in the context of several other federal statutes.

*Id.*[10] The circuit court went on to list additional matters of fact that a reviewing court must consider, *inter alia:*

... (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used or the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* *Accord Haavistola,* 6 F.3d at 222 n. 4; *Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156 (11th Cir.1988); *Diggs,* 847 F.2d at 272–73. *See also Garrett,* 721 F.2d at 981–82; *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32 (3d Cir.1983) (cases applying *Spirides* analysis to identical definition of "employee" under Age Discrimination in Employment Act). *Cf. Mitchell v. Frank R. Howard Memorial Hosp.,* 853 F.2d 762, 766 (9th Cir.1988), *cert. denied,* 489 U.S. 1013, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989) (applying test similar to *Spirides* analysis). Several states have also adopted the *Spirides* hybrid test. *See, e.g., Duplessis v. Warren Petroleum, Inc.,* 672 So.2d 1019,

---

**10.** We note that the Maryland common law test of an employment relationship also focuses primarily on the power to control the "employee." *Whitehead,* 304 Md. at 78, 497 A.2d 803. We therefore view the *Spirides* test as compatible with Maryland law.

1024 (La.Ct.App.1996); *St. Luke's Health Sys. v. Dep't of Law, Civil Rights Div.*, 180 Ariz. 373, 884 P.2d 259, 264 (App.1994) ("In our view, the hybrid test is the most reasonable and workable test."); *Moore v. Labor & Indus. Review Comm'n*, 175 Wis.2d 561, 499 N.W.2d 288, 292 (App.1993); *Benavides v. Moore*, 848 S.W.2d 190, 193 (Tex.Ct.App.1992).

Relatively few federal courts—and no Maryland courts—have dealt directly with the situation in which a physician has alleged a Title VII cause of action for denial or revocation of staff privileges at a hospital. Those that have are split on the issue. In *Diggs*, the Fifth Circuit considered whether an obstetrician-gynecologist, who was denied staff privileges at the appellee hospital, was an "employee" of the hospital under Title VII. In affirming the district court's dismissal of the claim, the circuit court noted that "as a matter of economic reality, [an obstetrician-gynecologist] is dependent upon having hospital staff privileges in order to pursue her medical practice." *Diggs*, 847 F.2d at 273. Nevertheless, the court, applying the *Spirides* hybrid common law/economic realities test, stated:

> Furthermore, in determining her working relationship with the hospital, we are to focus more on the control factor ... While the hospital supplies the tools, staff and equipment utilized by Diggs in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does not direct the manner or means by which Diggs renders medical care. Diggs is under no duty to admit any of her patients to Harris Hospital, and Harris Hospital does not pay for her services.
>
> Diggs treated her patients in Harris Hospital without direct supervision ... The hospital does not provide salary or wages to physicians with staff privileges, nor does it pay their licensing fees, professional dues, insurance, taxes, or retirement benefits.

*Id.*

In *Beverley v. Douglas*, 591 F.Supp. 1321 (S.D.N.Y.1984), the District Court for the Southern District of New York

unequivocally found, on similar facts as the case *sub judice*, that physicians with voluntary privileges in a hospital are not "employees" of the hospital for purposes of Title VII. Applying the *Spirides* test, the court drew a distinction between full-time attending staff and voluntary attending staff. The former had hospital-based practices and were paid a salary by the hospital. In addition, the hospital paid their licensing fees, social security taxes, retirement benefits, and health and life insurance. They were covered under the hospital's malpractice insurance policy, and received office space and support staff. *Id.* at 1327.

In contrast, voluntary staff had practices outside the hospital and were self-employed or professional corporations. They received no salary and were paid directly by their patients. They received none of the benefits paid to the full-time attending staff—no retirement benefits, payment of licensing fees or dues, health or life insurance, or offices and support staff in the hospital. *Id.* Based on these facts, the court concluded, they were not employees.

In *Pardazi v. Cullman Medical Center,* 838 F.2d 1155 (11th Cir.1988), the Eleventh Circuit reached a similar conclusion. Upholding the district court's application of the *Spirides* analysis, the circuit court affirmed that under Title VII, Pardazi, an Iran-educated medical practitioner, was not an employee of the hospital which had denied him staff privileges. *Id.* at 1156. *Cf. Christopher v. Stouder Memorial Hosp.,* 936 F.2d 870, 877 (6th Cir.1991) (no contractual relationship existed between private scrub nurse and hospital under Title VII, where she was not paid by hospital, received no benefits or insurance, where hospital exercised no control over her work except "to the extent it could impose its uniform safety standards" on her, where she was not at any time required to perform services for the hospital itself, and where she worked directly for the doctor who hired her to assist in surgery for each specific operation); *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1342 (D.C.Cir.1973) (no employment relationship contemplated between hospital and private duty nurse where patient responsible for nurse's compensation and could

reject nurse for any reason, even though hospital controlled premises and access to patient).

In *Mitchell, supra,* the Ninth Circuit came to the opposite conclusion, but on different facts. Applying a test similar to that of *Spirides,* the court found that the doctor in that case was an employee of the hospital which had terminated a contract it had for him to provide radiology services. In reversing the district court's dismissal of the case for failure to state a claim, the Ninth Circuit noted that all radiology services were provided at the hospital, and the doctor's agreement provided that he would treat hospital patients. *Mitchell,* 853 F.2d at 766. He did not treat his own patients at the hospital. In addition, his agreement provided that he would receive a gross amount of the billings of the radiology department as compensation for his services. *Id.* at 767. The circuit court concluded that dismissal was improper because "it may be inferred ... that the Hospital enjoyed considerable control over 'the means and manner' of Dr. Mitchell's performance." *Id.*

In line with *Diggs* and *Beverley, supra,* we conclude that Dr. Bender was not an employee of Suburban for the purposes of Article 49B. Because the Commission's complaint was dismissed without a hearing by the circuit court, we will look at the facts in the light most favorable to the Commission. *See Whitehead,* 304 Md. at 75–76, 497 A.2d 803. Using the *Spirides* hybrid analysis, the following is undisputed and clear as a matter of law: first, Dr. Bender's work is usually done without supervision, by a specialist. It requires an extremely high degree of skill, perhaps more than any other occupation. Although the hospital furnishes the equipment at the hospital, Dr. Bender is under no obligation to admit her patients there. She is paid by her patients, not by the hospital, as Suburban does not pay salaries to physicians in private practice who are members of the medical staff and have privileges. Although the work is integral to the hospital, the hospital does not pay her retirement benefits, social security taxes, licensing fees, professional dues, or insurance. Dr. Bender is not covered by the hospital's medical malpractice insurance.

Most important, "in determining her working relationship with the hospital, we are to focus more on the control factor." *Diggs*, 847 F.2d at 273. The hospital does impose certain standards of professional care and behavior, but Dr. Bender is under no duty to admit any of her patients to Suburban, and Suburban does not direct the "manner" by which Dr. Bender renders medical care. *Spirides*, 613 F.2d at 831. She prescribes treatment as she sees fit, subject only to the right of the hospital to proscribe, in a blanket manner not specific to any particular physician, medical practices it deems "medically unacceptable". In fact, from the affidavits and supporting documents submitted to the circuit court, it appears that the hospital places a premium on a physician being available to treat his or her own patients.

Although she may be required to be "on call" at times for treatment of patients brought to the emergency ward at the hospital and to participate in committees or other activities,[11] this does not equate to control over the "means and manner" of Dr. Bender's practice, even within the hospital; and it is undisputed that Dr. Bender's practice would continue without privileges at Suburban. Certainly, the level of control Suburban may exercise over Dr. Bender is nowhere near the level exercised over the plaintiff in *Mitchell, supra*. Suburban does not pay Dr. Bender a salary, and Dr. Bender generally treats only her own patients at the hospital, not the hospital's patients. Accordingly, under the facts alleged by Suburban in its brief, its pleadings, and the supporting documentation submitted in the circuit court, we hold that Dr. Bender was not employed by Suburban for the purposes of Article 49B.

## II

Our inquiry does not end there, however. The Commission also argues that Article 49B does not require a direct employ-

---

11. *See Rivera v. Prince George's County Health Dept., et al.,* 102 Md.App. 456, 649 A.2d 1212 (1994), for additional discussion regarding on-call status of physician attached to hospital.

ment relationship; rather, it should operate to prohibit discrimination by an employer which would interfere with *any* employment opportunity of an *individual.* The Commission relies primarily upon *Sibley* and *Doe on Behalf of Doe v. St. Joseph's Hospital,* 788 F.2d 411 (7th Cir.1986), for this proposition. Suburban's denial of her application for renewed staff privileges, the Commission argues, would interfere with Dr. Bender's employment relationships with patients who depend on the proximity of Suburban for care, with other doctors on Suburban's staff who maintain "coverage relationships" with her, with Shady Grove Hospital,[12] and with those medical organizations that require board certification for participation.

In *Sibley,* the appellee, a private duty nurse who worked directly for patients under his care, had alleged that a hospital had discriminated against him on the basis of sex when it refused to refer him to patients requesting a private nurse whenever the patient was female. Because patients were responsible for paying the nurses directly and were charged for a full day's work even if the nurse was unsatisfactory, the appellee claimed that the hospital's actions foreclosed significant employment opportunities. *Sibley,* 488 F.2d at 1339–40. In reversing the district court's dismissal for failure to state a claim, the District of Columbia Circuit relied in part on the language of § 2000e—2(a) (the counterpart to FEPA § 16(a)(1)), which states:

**(a) Employer Practices**

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate against any individual* with respect to his compensation, terms, conditions, *or*

---

12. Dr. Bender currently has admitting privileges at Shady Grove Hospital, but she alleges that they will be terminated if she is not board certified by 1998. The Commission draws a link between Suburban's denial of privileges and the failure of Dr. Bender to obtain board certification, thus jeopardizing her future at Shady Grove.

*privileges of employment,* because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify *his employees or applicants for employment* in any way which would deprive or tend to deprive *any individual of employment opportunities* or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Id.* (emphasis added). The court then noted, "The Act defines 'employee' as 'an individual covered by an employer,' but nowhere are there words of limitation that restrict references in the Act to 'any individual' as comprehending only an employee of an employer." *Sibley,* 488 F.2d at 1341. In support of its conclusion that Title VII would protect discrimination which foreclosed this employment opportunity, the court noted that in passing Title VII, one of Congress's main goals was to "provide equal access to the job market for both men and women." *Id.* at 1341 (quoting *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 386 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). The court reasoned that, quite apart from the language of the Act,

... it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on indivious [sic] grounds, access by any individual to employment opportunities otherwise available to him. *To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.*

*Id.* (emphasis added). Several courts have since adopted the reasoning and conclusions enunciated in *Sibley. Accord, e.g, Christopher v. Stouder Memorial Hosp.,* 936 F.2d 870, 876–77 (6th Cir.1991); *Pardazi,* 838 F.2d at 1156 (Eleventh Circuit); *Doe,* 788 F.2d at 422–23 (Seventh Circuit); *Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1063 (2d Cir.1982)

*vacated on other grounds,* 463 U.S. 1223, 103 S.Ct. 3565, 3566, 77 L.Ed.2d 1406 (1983); *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 n. 3 (9th Cir.1980); *Livingston v. Ewing,* 601 F.2d 1110, 1114–15 (10th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979); *Pao v. Holy Redeemer Hospital,* 547 F.Supp. 484, 494–95 (E.D.Pa.1982); *Puntolillo v. New Hampshire Racing Comm'n,* 375 F.Supp. 1089, 1092 (D.N.H.1974).

We recognize the wisdom of adopting the conclusion reached in *Sibley* as to the scope of Title VII—and thus FEPA—especially in light of the declared policy of FEPA, contained in § 14:

> It is hereby declared to be the policy of the State of Maryland, in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers to assure *all persons equal opportunity in receiving employment* ... regardless of ... sex ... and *to that end to prohibit discrimination in employment by any person ... or any employer or his agents.*

*Id.* (emphasis added). The policy described in § 14 protects all "persons," not "employees," and also prohibits "discrimination in employment by *any person.*" This would suggest that the General Assembly wished to encompass, within FEPA's protective scope, discrimination which affects employment opportunities outside the scope of direct employment with the employer. This belief is buttressed by the disjunctive prohibition of discrimination by "any person ... or any employer ..." (supporting a conclusion that "any person" must mean someone other than an employer), and by the same distinction drawn in § 16(a)(2) between "employees" and "any individual" (supporting a reading that "any individual" encompasses those who are not employees or applicants for employment). When added to the *Sibley* court's observation that [§ 16(a)(1)] does not refer to "employees," but rather to "any individual," *Sibley,* 488 F.2d at 1341, and to the mandate that "Title VII of the Civil Rights Act should not be construed narrowly,"

**96** 

*Christopher,* 936 F.2d at 874, a strong argument is made for holding the protection of FEPA applicable when an employer forecloses employment opportunities for anyone through invidious discrimination.[13]

 We do not reach this question on the facts presented in the case *sub judice,* however; therefore, we leave the adoption or rejection of *Sibley* for another day. We can, however, state unequivocally that FEPA protects only discrimination in "employment." In other words, there must be an employment relationship at stake; the Commission must establish "some link between [Suburban's] actions and some employment relationship involving [Dr. Bender]." *Johnson v. Greater Southeast Community Hospital Corp.,* 903 F.Supp. 140, 156 (D.D.C.1995); *Beverley,* 591 F.Supp. at 1328 ("In order to invoke Title VII, plaintiff must allege and prove some link between the defendants' actions and an employment relationship."). Assuming the truth of all of the Commission's allegations concerning the collateral effects of the loss of staff privileges on Dr. Bender's professional relationships, we see

---

**13.** The court's holding in *Sibley* rested in part on the particular language of that section of Title VII providing for the filing of complaints with the Equal Employment Opportunity Commission (EEOC); that section did not use the term "employee," but rather "person aggrieved." § 2000e–5(b). The *Sibley* court saw this language as yet another indication that Congress intended to prohibit under Title VII any interference with an employment opportunity. *Sibley,* 488 F.2d at 1341.

Although we see merit in adopting the *Sibley* court's conclusion as to the scope of FEPA, we cannot base our conclusion on this aspect of *Sibley* 's analysis. The General Assembly used essentially the same language in Article 49B, when it bestowed on "any person claiming to be aggrieved" the right to complain of discrimination to the Commission. § 9A(a). As opposed to the right of action conferred by § 2000e–5(a) of Title VII—which applied *only* to discrimination in *employment* opportunities—§ 9A(a) of Article 49B governs the enforcement of rights conferred by the prohibitions of discrimination in employment, public accommodations, and to some extent, housing. In other words, the Commission, unlike the EEOC, enforces more than just a ban on employment discrimination. In this context, we cannot rely on the language used in § 9A(a) in the same manner that the *Sibley* court relied on § 2000e–5(b) of Title VII.

implicated no employment relationship protected by the Act, even if we were to adopt *Sibley*.

The Commission first alleges that Suburban's denial of privileges interferes with Dr. Bender's employment by her patients, because of the inconvenience these patients face in being treated at Shady Grove Hospital rather than at Suburban. We accept at face value that these patients may face something of an inconvenience, and we even assume that some or all of them may stop going to Dr. Bender for care because of the loss of her privileges. In our opinion, however, this does not rise to the level of interference necessary to state a claim under Article 49B. The Commission's reliance on *Sibley* is misplaced due primarily to the nature of the employment relationship at stake in that case. In addition, we disagree with the majority opinion in *Doe*, as we explain *infra*.

As a subset of the *Sibley* analysis, the *extent* of the interference with an employment relationship necessary to invoke Title VII has been hotly debated in the courts. In *Sibley*, the private duty nurse was entirely dependent upon the hospital for access to her patients; without the hospital's referral, she had no relationship with any particular patient. Faced with this set of facts, the *Sibley* court held the interference prohibited under Title VII. *Sibley*, 488 F.2d at 1342; *see also Christopher*, 936 F.2d at 877 n. 3 (applying *Sibley* under the same set of facts, except that contract was between a private nurse and the doctors who employed her). *Cf. Pardazi*, 838 F.2d at 1156 (applying *Sibley* where denial of staff privileges to a doctor by a hospital may have interfered with a written contract of employment with a professional corporation).

In *Doe*, the Seventh Circuit extended the *Sibley* holding to a hospital's denial of staff privileges to physicians, rejecting the argument that *Sibley* applied only in situations when the interference *entirely* foreclosed access to patients. *Doe*, 788 F.2d at 423. Even in *Sibley*, the *Doe* court reasoned, the nurse's access to patients was not foreclosed at other hospitals, and so any interference with an employment relationship was within the purview of Title VII. *Id.* at 423–24. *Accord*

*Pao,* 547 F.Supp. at 494 ("Whether or not the plaintiff had access to, or could gain access to, other hospital facilities, is not relevant to the principal question whether his Title VII rights have been violated.").

We disagree with the analysis in *Doe.* First, we note that a Title VII claim does not *always* lie where the defendant controls access to employment. For example, a licensing board has the power to deny an applicant the ability to practice in a regulated industry, yet the applicant is not "employed" by the board. *Johnson,* 903 F.Supp. at 156 (citations omitted). Second, although staff privileges facilitate the doctor-patient relationship, Dr. Bender's access to patients is not *controlled* by Suburban—"the hospital has absolutely no control over [Dr. Bender's] ability to secure patients . . . ." *Id.* We agree with Judge Ripple's dissent in *Doe* that the hospital's access to the patients in *Sibley* was, as a practical matter, absolute, and that this makes the difference. *Doe,* 788 F.2d at 427. Because of the hospital's actions, the private duty nurse in *Sibley* could *never* treat those patients unless she happened across them by chance at some other hospital where she might work one day in the future.[14]

Dr. Bender's staff privileges at Suburban merely allowed her to treat patients *at Suburban.* Unlike the nurse in *Sibley,* Dr. Bender is free to treat her patients at her office or in any other health facility. The same is true for any patients the hospital may not refer to her or assign to her through the "on-call roster" it maintains. Assuming, *arguendo,* that her relationship with her patients is indeed one of employment, Suburban's actions do not interfere with that relationship. Suburban merely restricts the *place* of carrying out *some*—not all—aspects of that employment. Article 49B does not apply in that situation.

Even if Article 49B recognized the "interference" alleged in this case, our conclusion would not change. Assuming that

---

**14.** A similar situation occurred in *Pardazi.* The hospital's actions in that case threatened to foreclose *completely* the physician's relationship with his future employer. *Pardazi,* 838 F.2d at 1156.

the scope of the hospital's control over Dr. Bender's relationship with her patients was sufficient for purposes of Title VII, we would still hold that Title VII does not apply because the patient/doctor relationships at issue in this case are not employer/employee relationships. The reasoning set forth by the Fifth Circuit Court of Appeals in *Diggs* is persuasive on this issue. Analyzing whether a doctor, denied staff privileges at a hospital, stated a claim under Title VII based on the hospital's interference with her relationship with her patients, the court affirmed that a Title VII claim "must involve discriminatory conduct that affects an employment relationship of the complainant, as determined by the application of the economic realities/common law control test." *Diggs*, 847 F.2d at 274. The court reasoned:

> Under the above test, Diggs's relationship with her patients is decidedly not one of employment. Her patients did not control the manner and means of her professional treatment. A physician's work involves considerable skill. Further, patients do not furnish the equipment, instruments, supplies, and support staff used in a physician's rendition of medical care. Payment is for services rendered, not on-going compensation. Additionally, a physician provides care for numerous patients within a short period of time.

*Id.* This analysis seems directly applicable to the case *sub judice*. Even more appropriate is the discussion in *Johnson* on the same subject. In support of its conclusion that the relationship between physician and patient is appropriately characterized as that of an independent contractor relationship, the United States District Court for the District of Columbia stated:

> It is beyond dispute that a patient does not control the "manner and means" of a physician's medical services. The practice of medicine is a highly specialized and skilled occupation. A patient simply cannot exercise the sort of detailed control over the "manner" of a physician's work that is normally found in the employer-employee relationship. The same is true for the "means" by which a physi-

cian practices medicine. Patients do not provide the equipment that is used by physicians in treating them. Patients do not provide physicians with the office space and examining rooms in which to practice.

*Johnson*, 903 F.Supp. at 155. Applying the *Spirides* factors first espoused in the District of Columbia Circuit, the district court found the doctor/patient relationship to be the "classic independent contractor relationship":

> ... (1) a physician's work is normally conducted without supervision by [the] patient; (2) the practice of medicine is a highly skilled and specialized profession; (3) neither the equipment nor the place of work is provided by the patient; (4) a physician's work with respect to individual patients is usually brief and/or episodic; (5) the method of payment varies with [the] patient and the particular services rendered; (6) the work relationship can be terminated at will by either the patient or the physician; (7) no annual leave is provided by the patient; (8) the services provided by the physician are typically not an integral part of the work of the patient; (9) the patient provides no retirement benefits for the physician; (10) the patient pays no social security taxes; and (11) patients generally do not intend to become a physician's employer.

*Id.* at 155–56. *Accord Mitchell*, 853 F.2d at 767 (traditional physician/patient relationship is not one of employee/employer and as such is not protected under Title VII); *Beverley*, 591 F.Supp. at 1328 (assuming no employment relationship between doctor and patients).[15] We think the analysis of these cases directly applicable to the case at hand. Dr. Bender may

---

**15.** We note that other courts have come to a different conclusion, but we find their decisions distinguishable. *Doe* merely noted in *dicta* that "it is far from certain that the doctor-patient relationship would not be protected under a *Sibley* analysis," *Doe*, 788 F.2d at 425, but did not decide the issue. *Pao* simply assumed it was protected, without discussion. *Pao*, 547 F.Supp. at 494. *Sibley* did the same in the context of private duty nurses, who were paid directly by their patients. *Sibley*, 488 F.2d at 1342. *Pardazi* invoked Title VII on the basis of interference with a written contract of employment with a professional corporation. *Pardazi*, 838 F.2d at 1156.

not base an Article 49B claim on Suburban's interference with her relationships with patients.

▪ Moreover, no FEPA claim lies for interference with the "coverage relationship" between Dr. Bender and other physicians. Although Dr. Bender is not a member of an organized health plan, the Commission maintains, she is in a coverage group with three other general practice physicians. As part of her obligations under the coverage agreement, she is responsible for patients at Suburban. In addition, her coverage physicians participate with preferred provider plans which specify that they must provide coverage for their patients at Suburban at all times. Without privileges at Suburban, the Commission asserts, Dr. Bender cannot fulfill her obligations under the coverage agreement.

Again accepting these allegations at face value, we see no employment relationship implicated here. Dr. Bender's relationship with the other doctors is aptly named—"coverage." It is a purely contractual relationship; the Commission does not assert that these other doctors control the "means and manner" by which Dr. Bender treats her coverage patients. The record is silent as to who pays Dr. Bender for her services pursuant to her coverage obligations, so we will assume her coverage physicians do. Nevertheless, they pay no benefits, provide no equipment or supplies, and pay no taxes or other monetary obligations. Most important, they do not control the "manner" by which Dr. Bender exercises her professional judgment in the care of their patients.

▪ The Commission's last two claims of interference are linked by a common factor—board certification. As a physician board-eligible in internal medicine, Dr. Bender would like to obtain her certification. One of the requirements is that the hospitals where she has privileges must attest to her current appointment. Suburban refused to do so in a positive manner, eventually causing Dr. Bender to withdraw one certification application to the American Board of Internal Medicine. The Commission alleges that because of Suburban's actions, Dr. Bender cannot become board certified. Shady

Grove Hospital, the other hospital where Dr. Bender exercises staff privileges, requires board certification as a·condition of holding a medical staff office. If Dr. Bender does not become board certified by the end of 1998, her privileges there will not be renewed. In addition, the Commission claims, Dr. Bender may wish to participate in a Preferred Provider Organization (PPO), seek privileges at another hospital, or work at an institution or an insurance company. Many of these positions require board certification as a condition of employment.

Again, we accept the truth of the allegation that Shady Grove Hospital will not renew Dr. Bender's privileges after 1998 if she does not become board certified. We will also assume that the denial of privileges will prevent Dr. Bender from becoming certified, an assertion hotly contested by Suburban. Nevertheless, we decline to apply *Sibley* for two reasons. First, as we stated *supra*, for *Sibley* to apply, the opportunities interfered with must be in the nature of *employment* relationships. *Diggs*, 847 F.2d at 274. We see no indication that an employment relationship exists between Shady Grove Hospital and Dr. Bender any more than between Suburban and Dr. Bender; in fact, the Commission asserts repeatedly that Suburban exercises a *greater* degree of control over its physicians than most area hospitals (which would include Shady Grove Hospital). Thus, no employment relationship is at stake.

Second, even if we were to perceive a possible employment relationship between Dr. Bender and Shady Grove Hospital, the link between Suburban's actions and Shady Grove Hospital's termination of staff privileges is simply too tenuous to invoke *Sibley*. As Judge Posner recently pointed out, *Sibley* should not be construed as to create for employers a *blanket* liability to employees of other employers for interference with their employment relationships. *See E.E.O.C. v. Illinois*, 69 F.3d 167, 169 (7th Cir.1995). We must draw the line somewhere. Under these facts, we draw it here. Otherwise, the denial of board certification may prove to be the hub of a wheel with a hundred spokes; put simply, there are just

too many possible effects to justify foisting liability for all of them onto Suburban. We do not intend to set forth here a bright-line rule of how many degrees an "interference with an employment relationship" may be removed from the discriminatory act; we merely state that it is too far removed in this case to state a claim under Article 49B.

We arrive at the same result, for the same reason, when we consider the effects of Suburban's denial of staff privileges on Dr. Bender's possible future employment with other professional organizations. Physicians may be employees of Health Maintenance Organizations in Maryland. *See Patel v. Healthplus, Inc.*, 112 Md.App. 251, 258–59, 684 A.2d 904 (1996) ("staff model" of HMO employs salaried health care professionals to provide health care services). Nevertheless, we believe the link between Suburban's denial of Dr. Bender's staff privileges, the possible resulting denial of board certification, and thus the possible denial of employment, to be too tenuous to be actionable under Article 49B under any scenario. If anything, it is even more tenuous than the link pertaining to Shady Grove Hospital. At least in that instance, Dr. Bender maintains an actual working relationship with that hospital. In its latter argument, the Commission merely speculates as to "possible" employment with preferred provider organizations or other employers.

## CONCLUSION

For the reasons detailed *supra*, we dismiss the appeal of the denial of *ex parte* injunctive relief as moot, we dismiss the appeal relating to interlocutory injunctive relief as premature, and we remand to the circuit court. On remand, the circuit court should deny the interlocutory injunctive relief and dismiss the § 4 action on the basis that the Commission has no "likelihood of success" on the merits, as Suburban's action does not give rise to a claim under Article 49B. Applying the *Spirides* common law/economic realities test, we conclude that no employment relationship exists between Dr. Bender and Suburban. Furthermore, assuming FEPA's protection extends to an employer's interference with a complainant's em-

ployment relationships with third parties, on the facts of this case the Commission can establish neither the requisite degree of interference, nor the required "employment relationship" with a third party.

**APPEAL DISMISSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS TO DISMISS IN ACCORDANCE WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLANT.**